**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term**
**Grand Jury Sworn in on June 14, 2024**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:24-cr-** |
| | : | **MAG. COURT NO. 1:24-mj-258** |
| | : | |
| **v.** | : | **VIOLATION:** |
| | : | |
| **TRAYON WHITE, SR.,** | : | **COUNT ONE:**   18 U.S.C. § 201(b)(2) |
| | : | (A), (B), and (C) |
| | : | (Bribery) |
| | : | |
| | : | |
| **Defendant.** | : | |

## INDICTMENT

The Grand Jury for the District of Columbia charges that at times material to this indictment, on or about the dates and at the approximate times stated below:

### The Defendant

1.     Defendant TRAYON WHITE, SR. (WHITE) was a resident of the District of Columbia. He was a member of the Council of the District of Columbia (Council), representing Ward 8. WHITE was the Chairperson of the Committee on Recreation, Libraries and Youth Affairs, which oversaw several agencies including the D.C. Department of Youth Rehabilitation Services (DYRS). WHITE was a public official; that is WHITE acted for and on behalf of the District of Columbia in an official function.

2.     As a public official and Councilmember in the District of Columbia, WHITE had a lawful duty to perform his responsibilities consistent with the Council's Code of Official Conduct. The Code of Official Conduct prohibited WHITE from, among other things: (1) using his position to influence the outcome of a matter that he knew was likely to have a direct effect on his financial

interests; (2) receiving any compensation, salary, or contribution to salary, gratuity, or any other things of value from any source other than the District of Columbia government for his performance of official duties; (3) soliciting or accepting, either directly or indirectly, any gift from a "Prohibited Source"; (4) receiving anything of value in return for being influenced in the performance of official acts; (5) knowingly using the prestige of his office or public position for his financial gain or that of another; and (6) disclosing or using confidential or privileged information acquired by his position without authorization.

3.      The Council Code of Official Conduct defined a "Prohibited Source" as any person or entity that, among other things "has or is seeking to obtain contractual or other business or financial relations with the District Government."

4.      All Councilmembers were required to file yearly financial disclosures and certifications which, among other things, confirmed that they had: (1) complied with their duty to report known illegal activity, including attempted bribes, to the appropriate authorities; (2) not been offered or accepted bribes; (3) not directly or indirectly received government funds through illegal or improper means; (4) not received or been given anything of value, including a gift or political contribution, based on any understanding that the Councilmember's official actions, judgment, or vote would be influenced; and (5) that they completed a full ethics training within the last year. WHITE filed these financial disclosures and certifications for 2017 through 2023, the last of which was filed on May 15, 2024.

### Relevant Individuals and Entities

5.      DYRS was responsible for the supervision, custody, and care of young people charged with a delinquent act in the District of Columbia who were detained while awaiting adjudication or who were committed to DYRS by a D.C. Superior Court judge following adjudication. The

agency provided comprehensive support services to committed youth in secure facilities as well as within the community.

6.      Beginning in 2016, DYRS contracted with neighborhood-based organizations through its Credible Messenger Initiative to serve youth and families in neighborhoods most impacted by crime and incarceration. "Credible Messengers" were full-time employees of the neighborhood-based organizations who provided intensive mentoring and life coaching to DYRS youth and their parents/adult care givers. The "Credible Messenger" program included daily intensive support through evening group therapy sessions, support circles, crisis intervention, and 24-hour responsiveness. "Credible Messengers" also served as mediators and peace brokers in their own communities and throughout the District of Columbia.

7.      The Office of Neighborhood Safety and Engagement (ONSE) was a D.C. Government agency established to address violence in the District of Columbia and to assist families dealing with the grief and trauma caused by such violence.

8.      In 2018, the ONSE launched the Violence Intervention (VI) Initiative, a collaborative community engagement strategy designed to assist District of Columbia residents reduce gun-related violence in their communities. The ONSE contracted and partnered with community organizations to build partnerships with community members. The VI Initiative engaged individuals as Violence Interrupters, who were outreach workers who have an understanding of historical neighborhood conflicts. Violence Interrupters were responsible for: (1) building positive relationships with priority community members and developing partnerships with community organizations to implement violence intervention strategies; (2) serving as mentors to high-risk individuals; (3) identifying community and interpersonal conflicts with the potential to escalate to violence; (4) supporting the facilitation of ceasefires and mediations; and (5) responding to critical

incidents to conduct information gathering, rumor control, and de-escalation. Violence Interrupters worked with individuals, families, and communities most affected by violence, to help extricate people from cycles of violence. The ONSE received federal funding through the American Rescue Plan (ARPA).

9.     Confidential Human Source 1 (CHS 1) operated several businesses that contracted with the District of Columbia or received subcontracts from businesses that contracted with the District of Columbia.  As defined by the Council's Code of Official Conduct, CHS 1 was a "Prohibited Source." Thus, WHITE, as a Councilmember, was not permitted to solicit or accept gifts from CHS 1.

10.     Government Employee 1 was an official in the Office of the Attorney General for the District of Columbia.

11.     Government Employee 2 was an appointed public official in the Executive Office of the Mayor of the District of Columbia.

12.     Government Employee 3 was a high ranking official in the ONSE.

13.     Government Employee 4 was a Supervisory Grants Management Specialist at DYRS.

14.     Company 1, a Washington, D.C., corporation, was owned and managed by CHS 1. Company 1 held itself out as a community-based initiative to serve high-risk youths and adults throughout the District of Columbia and Maryland. As part of the ONSE's VI Initiative, Company 1 contracted with the D.C. Government to provide violence intervention services in Wards 1 and 4 in the District of Columbia.

15.     Company 2, a Washington, D.C., corporation, was owned and managed by CHS 1. As part of the ONSE's VI Initiative, Company 2 contracted with the D.C. Government to provide violence intervention services in Ward 5 of Washington, D.C.

4

16.     Company 3, a nonprofit organization, provided family and mental health services to individuals in the District of Columbia. In 2023, Company 3 was awarded three grants by the ONSE, for Fiscal Year 2024, to provide quality assurance, compliance, and fiscal management to subgrantees under the VI Initiative. The total value of the three grants was at least $10,702,945.60. The ONSE selected the subgrantees that contracted with Company 3 to provide the VI Initiative services.

### WHITE Begins Taking Bribes from CHS 1

17.     In 2016, Company 1 entered into a multi-year Human Care Agreement ("HCA"), worth $6,288,806, with the District of Columbia's Department of Human Services ("DHS"). The HCA term was for a period of one base year for the not-to-exceed price of $971,342, and four option years, for the respective prices of $1,241,736, $1,288,884, $1,337,922, and $1,388,922. The D.C. Government exercised option year one from October 26, 2017, through October 25, 2018, and option year two from October 26, 2018, through October 25, 2019. As part of this agreement, Company 1 would provide case management services for chronically homeless and other highly vulnerable individuals and families experiencing homelessness. In accordance with the HCA, Company 1 was required to conduct criminal background checks on "[a]ll positions listed in the Provider's business plan having direct contact with children/youth."

18.     In January 2019, the DHS determined that the majority of the background check documents submitted by Company 1 to DHS were falsified – in other words, Company 1 was affirming it conducted background checks that it did not, in fact, do.

19.     On February 25, 2019, the DHS determined that Company 1 was in default of the HCA and, as a result, terminated the agreement.

20.     On August 14, 2019, Company 1 submitted a claim to the D.C. Government's Office of Contracting and Procurement demanding $4,015,728, alleging that the HCA termination was improper and demanding that the termination for default be converted to a termination for convenience. On September 17, 2019, Company 1 lowered its monetary demand to $1,593,960.

21.     On December 12, 2019, the D.C. Government's Office of Contracting and Procurement denied Company 1's claim.

22.     On February 28, 2020, Company 1 filed a notice of appeal of its demand denial with the D.C. Government's Contract Appeals Board.

23.     On March 25, 2020, attorneys in the Office of the Attorney General for the District of Columbia moved for summary judgment on Company 1's appeal to the Contract Appeals Board.

24.     On May 18, 2020, the Contract Appeals Board dismissed the appeal after Company 1 and the D.C. Government entered into a settlement agreement, which did not result in a payment to Company 1.

25.     During that time period, WHITE accepted $20,000 in cash from CHS 1 in return for using his official position as a Councilmember to help CHS 1 resolve this contract dispute. Specifically, WHITE agreed to use his public position to pressure high ranking District of Columbia Government officials to resolve the dispute to CHS 1's benefit.

26.     On July 17, 2024, WHITE discussed that $20,000 bribe.  Specifically, WHITE referenced his attempt to coerce Government Employee 1 to resolve Company 1's contract dispute. WHITE said: "I have to work and put everything in play. I am just trying to make sure… because… last time we was trying to do something like this… that shit messed up my relationship… because I was going… I ain't gonna lie because we was trying to get [Government Employee 1] to do

something and he/she agreed to do it and he just never responded… and he just disappeared and stopped answering, even to this day."

## 2024 Acts in Furtherance of the Bribery Scheme

**Bribe Payment 1 – June 26, 2024**

27.     On June 26, 2024, CHS 1 and WHITE met in CHS 1's car, which was parked outside the location where WHITE was living.



(WHITE in CHS 1's car.)

28.     During the meeting, CHS 1 and WHITE discussed the VI contracts that Company 1 had with the ONSE: CHS 1 reminded WHITE that CHS 1's companies had large contracts with the District of Columbia Government, and CHS 1 asked WHITE to ascertain whether those contracts would be renewed. CHS 1 then told WHITE that he had $15,000 for him and gave WHITE an envelope containing $15,000 in cash. Initially, WHITE stated: "what you need me to

do, man? I don't, I don't wanna feel like you gotta gimme something to get something. We better than that." But WHITE put the envelope containing the money into his jacket pocket.



(WHITE putting the envelope with the $15,000 into his jacket pocket.)

29.    CHS 1 and WHITE then discussed the specific tasks that CHS 1 wanted WHITE to perform, including WHITE meeting with Government Employee 2, to "get an idea" of what would happen with CHS 1's contracts. WHITE stated: "So you trying to get an idea where they gonna go with the contracts?" CHS 1 confirmed that was the information he needed. CHS 1 added that "the biggest thing is just trying to figure out, are they keeping us this year with the contract."

30.    CHS 1 then proposed that they meet again in two weeks. CHS 1 told WHITE that he

would pay WHITE for his assistance with the contracts: "you know, we link up I guess another two weeks. But like I was telling you, I'm be able to keep hitting you off. You know what I mean?" While saying this, CHS 1 made a gesture with his hands mimicking giving money to WHITE. WHITE responded: "Yea."

31.     WHITE then mentioned that the D.C. Office of the Attorney General also runs a violence interruption program. WHITE explained that the D.C. Government was trying to combine the Office of the Attorney General's program with the ONSE's program to bring all the VI work into one office. WHITE then told CHS 1 that Government Employee 3 was unlikely to remain a high ranking official at the ONSE.

32.     CHS 1 then asked WHITE to determine the status of CHS 1's company's contract with the ONSE: "Are they going to give us a contract? Are they going to stay with the same vendors?" CHS 1 then told WHITE that: "It's cool, in two weeks, we can go over everything, go over your whole plan. But if you can, definitely man, that's for you, so definitely please take, please, please use that to take care of the stuff for [Government Employee 3]. You know what I mean?" To which WHITE responded, in part, "Yea."

33.     CHS 1 and WHITE concluded their meeting with a discussion of other opportunities for WHITE and CHS 1 to work together, where WHITE would assist CHS 1 in securing contracts with the D.C. Government:

> CHS 1:     I was gonna say too, even something to think about too, I can do something like this twice a month, for right now, for the next 90 days. But I want, I wanna strategically work with you to like…
>
> WHITE:     And I've got other shit we can be doing too.
>
> CHS 1:     That what I'm saying. That's what I'm saying. I want to knock this out. Then for the next meeting, let's brainstorm and go over everything. That's cool?

| WHITE: | What I want you to start thinking about is how we get into the mental health space…. |
|---|---|
| CHS 1: | I gotta go. I gotta jet. Listen. Listen. Two weeks …. |
| WHITE: | You ain't gonna disappear on me. |
| CHS 1: | No. No. No. Listen this is my word bro. |
| WHITE: | Like there's so much shit we be doing. |
| CHS 1: | That's what I'm saying. |
| WHITE: | Got four more new years… |

The meeting concluded, and WHITE exited CHS 1's car.

**Bribe Payment 2 – July 17, 2024**

34.     On July 17, 2024, CHS 1 and WHITE met in CHS 1's car, which was parked outside the location where WHITE was living.



(WHITE in CHS 1's car.)

35.     WHITE updated CHS 1 on his efforts to pressure the ONSE and DYRS to extend their grants to Company 1 and Company 2. CHS 1 offered and White accepted a kickback of 3% of

each grant's value in exchange for WHITE agreeing to pressure the ONSE and DYRS to extend their grants to Company 1 and Company 2.

36.    WHITE reported that he had followed up with Government Employee 2 but that he/she was not very helpful. To circumvent Government Employee 2, WHITE said that he had contacted two DYRS employees who oversaw certain DYRS grants: "So what I did was, I connected with two of the people that's over top of giving out the grants… One of them… now this the, this where I am now, I don't know all of them personal yet." WHITE then stated he was in contact with Government Employee 4 and that he was scheduled to meet with him/her later that day: "I been talking to [Government Employee 4] all week. Just kind of building relationship, just trying to feel [him/her] out… and I got a follow-up conversation with [him/her] today… So what I'm doing is I'm circumventing the head [Government Employee 2] and dealing with the relationships on the ground, you know what I'm saying…. because I don't know [Government Employee 2] that well to really have a…(gestures hands back and forth) like we talk."

37.    CHS 1 produced a ledger (depicted below), listing all of Company 1's and Company 2's grants from D.C. Government agencies, the total value of each grant, and WHITE's corresponding 3% cut:



38.    CHS 1 and WHITE discussed the individual VI contracts:

CHS 1:        What I was thinking with you, is, if you are able to seal this up.

WHITE:        Yea.

CHS1:         I will give you 141[,000].

WHITE:        (Looking at the paper) Okay.

CHS 1:        Which is 3%.

WHITE:        (Nods his head in the affirmative)

CHS 1:        So 3% of the 51, I mean 3% of 1.7 is 51[,000].

WHITE:        Okay.

CHS 1:        3% of 1.3 is 39[,000].

WHITE:        Now. Question. All these through the ONSE office?

CHS 1:        This is through the ONSE and this is…

             (WHITE showed his telephone to CHS 1.)

WHITE:        Tomorrow, looking who I am meeting with tomorrow…

CHS 1:        [Government Employee 3]

WHITE:        Tomorrow. So I have been lining everything up.

CHS1:         Makes sense.

WHITE:        You know what I'm saying, because I ain't gonna miss the mark… what I am trying to do is cross all, cross all sectors… I got to find [Government Employee 4's] number though. [She/he] did call me.

39.     WHITE then noted that Government Employee 3 was the high ranking official, and that Government Employee 3 did not know if she/he was going to be made the permanent high ranking official of the ONSE. WHITE said: "that's why I want to go talk to [him/her] and tell [him/her] I can be supportive of this, this and this, now this, this and this… I am just going to tell [him/her] I don't know how much I can be supportive if this don't happen… I am just being real." WHITE explained that part of the reason for setting the in-person meeting at the ONSE was: "cause I really want to walk around there and see who works there. So I am going there in person… cause I kinda want to get a feel for whose running what…because there's people making decisions that may not have a high title."

40.     WHITE then searched his telephone and found the name of the person he had previously referenced from DYRS, Government Employee 4. WHITE mentioned that he was going to meet with Government Employee 4:

WHITE:        Oh, [Government Employee 4] … oh, here you go… this her/him right here.

CHS 1:        [Government Employee 4] going over to ONSE?

WHITE:        [Government Employee 4]?

CHS 1:        She/he going over to the ONSE?

WHITE:        No. She/he at DYRS.

CHS 1:        Yeah. Yeah. Yeah. So the Credible Messenger [unintelligible].

WHITE:        Yeah.

                              *                    *                    *

WHITE:        [Government Employee 4].

CHS 1:        I have never met her/him before. I have just seen her/him on a few emails...
              I did submit this stuff. So you, you know her/him?

WHITE:        I, I'm meeting [her/him], I don't know [her/him] prior to this.

CHS 1:        Gotcha, gotcha, gotcha. So you, so you may be able to solidify that too then.

WHITE:        (WHITE nodded his head yes) I got to meet with her/him today.

CHS 1:        Yeah. So that's right here. That number right here: 15.

WHITE:        I have been texting back and forth this week and I told her/him I need to
              meet with her/him in person, today.

CHS 1:        Gotcha

WHITE:        I didn't know if you wanted to meet [with her/him]. I wanted to keep you
              isolated.

CHS 1:        Yea...I definitely...but look... I did the numbers for that. So that will be
              15. That's 15K. 3% of the 500k.

While stating the above, CHS 1 referenced the ledger (depicted above) that WHITE was reviewing,

noting the numbers that corresponded to Company 2's Credible Messenger contract with DYRS.

    41.    Later in the conversation, CHS 1 again referenced the ledger listing the contracts and

payments:

CHS 1:        Are these all agreeable to you?

WHITE:        Gave me. Yeah. You gave me... I mean we, we good, we can worry about
              the money later. This issue is, stay on, stay on mission... make sure we still
              can...keep everybody. Keep everything afloat cause...

CHS 1:        But if you need anything, I can meet you back in an hour.

14

WHITE:          Yeah. I'm hurting. I've been hurting for a minute.

After WHITE said that he was "hurting," CHS 1 agreed to meet WHITE in an hour to give him another cash payment.

42.     CHS 1 and WHITE then discussed business opportunities in the mental healthcare space, which WHITE had broached in their June 26, 2024 meeting. CHS 1 expressed an interest in partnering with WHITE on contracts for mental health services. WHITE estimated that the value of the contracts could be $15 to $20 million. CHS 1 remarked "3% of that is good." When WHITE explained that he wanted to determine CHS 1's interest in this business, CHS 1 repeatedly stated, "let's do this." WHITE responded "yea." The conversation continued:

CHS 1:          This ain't nothing compared to that [referencing the DYRS and ONSE contracts]

WHITE:          (nodded in agreement) And that shit federal...that shit ain't never going nowhere...never...

CHS 1:          Its more stable...

WHITE:          You ain't gotta keep waiting for it...

CHS 1:          Its more stable...

WHITE:          Man that shit ain't going nowhere...

CHS 1:          And once you get the clients, you keep'em.

WHITE:          That shit ain't going nowhere, bro...that shit a cash cow.

CHS 1:          Let's do it man.

43.     WHITE then suggested that they also explore the housing sector: "The last piece of that is housing. Housing is where you are going to get most of the money because ... [motioned with hands] around the clock, its different than the DYRS shit, that shit... man..."

44.     They agreed to meet again shortly, and CHS 1 left to retrieve the cash that WHITE had previously requested.

45.    Approximately an hour later, CHS 1 returned to the location of his last meeting with WHITE. CHS 1 asked WHITE, if they met again in a few weeks, how much money WHITE would want. WHITE responded: "Let's play it by ear because I don't really got no real demand at the moment. I got to work to put everything in play... So I just want to put everything in place, so I can put everything in motion."

46.    CHS 1 then handed WHITE an envelope with $5,000, that WHITE had requested. CHS 1 said: "that's for, making sure you reach out to [Government Employee 3] and [Government Employee 4]." WHITE responded: "I am on top of all that... you know me, I'm already moving. I'm going to put ...Once you and I lock eyes and gets to an understanding, I gets to work. I can start making some shit happen." White then referenced his meeting with Government Employee 4 later that day and meeting with Government Employee 3 the next day.



(WHITE receiving an envelope containing the $5,000 payment.)

47.    CHS 1 and WHITE then discussed additional bribe payments. CHS 1 told WHITE to let him know how much he wanted and CHS 1 would provide it.

**Bribe Payment 3 – July 25, 2024**

48.     On July 19, 2024, WHITE texted CHS 1, stating that he needed to meet and that it was "urgent".   (In the text messages, the white bubbles are messages from WHITE, and the green bubbles are messages from CHS 1.)



49.     WHITE explained he wanted to introduce CHS 1 to an individual who could help them get into the mental healthcare space:



50.     WHITE also told CHS 1 that he had a meeting with two high-ranking government officials to facilitate CHS 1's obtaining contracts with the D.C. Government:

17



51.     On July 24, 2024, WHITE texted CHS 1, asking to meet. WHITE wanted to update CHS 1 on his progress facilitating the renewal of Company 1's and Company 2's contracts with the District of Columbia Government. WHITE also wanted to receive another payment. In addition, following the private meeting between CHS 1 and WHITE, they planned to meet another individual to discuss business opportunities in the mental healthcare space. WHITE specifically requested that CHS 1 "bring 10."  When CHS 1 responded that he could only give WHITE "5," WHITE responded: "Please do 10. I have to keep my word."




52.     On July 25, 2024, WHITE met CHS 1 in CHS 1's car, which was parked on a street in

Washington, D.C.

53.     After entering the car, WHITE said: "I feel good energy about what we embarking on,

what we trying to do. I want to bring you up to speed before we go in here about stuff I've been

working on, trying to get you where you need to be."

54.     WHITE told CHS 1 that he had spoken with Government Employee 4 about the

renewal of the Company 2's Credible Messenger contract with DYRS:

WHITE:          So I followed back up with that [guy/girl].

CHS 1:          [Government Employee 4]?

WHITE:        Yes.

CHS 1:        The grant manager.

WHITE:        Yea. That's looking good…that looking good there.

CHS 1:        Like 48 applicants applied or something…

WHITE:        I don't know. I didn't get the details. I just told [Government Employee 4] where I stood and what I need to see happen.  Then I followed up with … umm…

CHS 1:        And [Government Employee 4] was like, [Government Employee 4] was like on board with it?

WHITE:        Yea, [Government Employee 4] all the way, [grant manager] all the way a go.

CHS 1:        Okay.

WHITE:        It's [Government Employee 4] and another lady. So [Government Employee 4] got to work to massage her….[Government Employee 4] got to work to massage the other [person]. But I'm going to stay in communication with [Government Employee 4] because [Government Employee 4] definitely gonna be helpful. But I think that was a small, that was the smaller one of the two.

55.     CHS 1 produced the ledger listing the four contracts (three with the ONSE and one with DYRS) and laying out the total amount of each grant and WHITE's 3% cut. WHITE reviewed the ledger as CHS 1 explained that WHITE would be paid $15,000, which is 3% of the $500,000 contract with DYRS for the Credible Messenger program:

CHS 1:        Lemme show you… so trying to recap 'cause if get the credible messenger jump, 500.

WHITE:        Yes.

CHS 1:        Cause you get the 15.

WHITE:        Yes.



(WHITE in CHS 1's car, reviewing the total amount of each contract and WHITE's 3% cut.)

56.    CHS 1 and WHITE then discussed the three VI contracts with the ONSE:

CHS 1:    Then we get these three ONSE, that's underneath [Government Employee 3].

WHITE:    Alright

CHS 1:    Floating team, [Company 1] [Wards] 1 & 4 and Ward 5 Violence Prevention Network.

WHITE:    So let me talk about those three real quick. So I met with [Government Employee 3].

CHS 1:    [Government Employee 3's title.]

WHITE:    I wasn't able to talk to [Government Employee 3] as direct as I need to be because there was another person in the room.

CHS 1:    Mmm hmm.

WHITE:    But I told [Government Employee 3] what I would like to see happen and…

CHS 1:    And was it more like try keep the same people?

WHITE:    Yeah. No, I mentioned and I tell [Government Employee 3] [Company 1].

21

CHS 1:          Okay.

WHITE:          You know, um, 'cause I don't wanna speak too general. I told [Government Employee 3], you know it, but, and [Government Employee 3] was confused because she/he's like, is [Company 1] even in your ward. Mm-Hmm. And I'm like, uh, so I, so I, I mentioned [Company 4] too, just because I like these two...

57.     WHITE said that he did not believe that Government Employee 3 would be appointed to a permanent role at the ONSE, as he had been asked by a senior D.C. Government official to provide a list of possible replacements. WHITE said that he told Government Employee 3, "the only way I'm gonna support you, if you support me. Because I have to sign off on [his/her] confirmation. Now I'm only one of 13. They can still get it passed without me. But I'm a huge voice when it comes to violent prevention and the Council. Just cause who I am, you know, the work I've been doing." The use of Government Employee 3's job as leverage had been mentioned by WHITE, during his prior meeting with CHS 1 on July 17, 2024, when CHS 1 gave WHITE a $5,000 payment.

58.     WHITE then said: "We in a good place with the ONSE, but I want to make sure that we cross the finish line and get to what we want to get with this . . . ." WHITE added: "I think that I got to massage it a little bit more and I got. I got an inside person that I am working with on . . . ." At that point, CHS 1 handed WHITE an envelope containing the $10,000 in cash that WHITE had previously requested.



(WHITE putting an envelope containing the $10,000 payment into his jacket pocket.)

59.    As WHITE accepted the payment, CHS 1 stated: "You def going to keep it going right?" WHITE responded "yea, yea, I'm... I have a long-term strategy I'm working on but I want...what I am trying to get from them is the inside people, that who I am working with.  I got one person, it's a lady, she doesn't want me to say her name but I am working with her and I think that's going to help us get in further beyond this, to get some other stuff going." WHITE concluded the meeting saying: "I think that we, as far as the stuff we got going now, it's cool but we got to also start thinking about other stuff."

**Bribe Payment 4 – August 9, 2024**

60.    On August 2, 2024, CHS 1 texted WHITE to get an update on WHITE's progress securing the contract renewals for Company 1 and Company 2. WHITE responded: "Waiting on

one call. Heard it was this week. Pushing on Wednesday, so I'm hoping it's before Thursday."



61.    On August 8, 2024, CHS 1 texted WHITE to setup a meeting to get an update on the status of the contract renewals. CHS 1 asked WHITE if he needed him to "bring anything." WHITE initially responded: "Let me check on that in an hour when I wrap up this meeting." WHITE later texted: "Nothing is needed unless you're feeling generous lol."  CHS 1 responded: "I'm definitely feeling generous if we got project 1 and 2 on lock tomorrow." "Project 1" and "project 2" were references to CHS 1's contracts with the ONSE and DYRS. WHITE responded: "I haven't seen anything in writing, but from what I'm being told you should be good on both." CHS 1 responded: "If you knock it out the park I got you. What sounds to you."

 

62.    On August 9, 2024, WHITE responded: "Can you do half?" CHS 1 agreed to give WHITE $5,000.

63.    Later that morning, at approximately 10:30 a.m., WHITE met CHS 1 in CHS 1's car, outside a residence located in Washington, D.C.



(WHITE in CHS 1's car.)

64.    After entering the car, WHITE provided an update on the status of his efforts to pressure

government employees to renew CHS 1's company's contracts:

| | |
|---|---|
| CHS 1: | Yeah. I talked to [Person 1]. He said he talked to some of the program people said things is looking good on your end. |
| WHITE: | Yeah. |
| CHS 1: | How'd everything work out with your folks? |
| WHITE: | Yeah, he said everything looking good. |
| CHS 1: | You talked to [Government Employee 4]? |
| WHITE: | I talked to, I told you who I talked to. I talked to uh, I talked to so many people fucking with you man, I don't even like talking to. I talked to [a senior D.C. Government official]. I talked to [Government Employee 2] that's who really, that's who really… |
| CHS 1: | That's for the ONSE joint. |

| | |
|---|---|
| WHITE: | But [he/she], [Government Employee 2], [he/she control] the ONSE. |
| CHS 1: | Yeah. |
| WHITE: | I talked to um, uh, [Government Employee 3]. Now, I really told [him/her] that if [he/she] don't support me and what I'm trying to do with my, both my service providers, I can't support [him/her], uh, getting 'cause [he/she] not confirmed yet. |
| CHS 1: | For the [high ranking position]. |
| WHITE: | Ya, I said I can't confirm. I just basically said it like that. You know what I'm saying? |
| CHS 1: | Mm-Hmm. |
| WHITE: | In a way to show like, listen, you do this, I can do this or you can't do this, I can't do that. |
| CHS 1: | Mm-Hmm. |
| WHITE: | Yeah. I got great weight when it comes to violence and work on that council. |

The use of Government Employee 3's job as leverage was mentioned by WHITE, during his prior meetings with CHS 1 on July 17 and 25, 2024.

65.    CHS 1 then handed WHITE an envelope containing the "half" he requested, which was $5,000 in cash. As he gave the cash to WHITE, CHS 1 stated that the payment was because "I know you've been handling your business." WHITE responded "Yeah." CHS 1 then confirmed that he had just listed the people whom WHITE had promised to pressure "[b]ut I you just went down the list to everybody." WHITE then stated, "Yeah man. I'm gonna do mines."



(WHITE receiving an envelope containing the $5,000 payment.)

66.    CHS 1 and WHITE then discussed WHITE's efforts to pressure employees of DYRS

to approve Company 2's contract for the "Credible Messenger" program:

WHITE:      So I talked to her, man. who else I talk to? I talked to, um…

CHS 1:      [Government Employee 4].

WHITE:      What's the guy name? I can't remember all these people name. It was a guy at the, it was a guy at, um, I talked to somebody at DYRS. I talked to somebody at the ONSE office.

CHS 1:      I think it was [Government Employee 4], you said.

WHITE:      [Government Employee 4]? I told you the name. I don't remember.

CHS 1:      It was [Government Employee 4].

28

| WHITE: | [Government Employee 4], okay. But it was, I, I, I talked to it is another lady that I'm working with that got insight on what's going on. I been, I've been talking to her. I met with her one time. I talked to her too. But it's a, uh, who else I met with? Man, I been meeting with all these people, man. |
|---|---|
| CHS 1: | Mm-Hmm. |
| WHITE: | Um, just to kind of... |
| CHS 1: | Appreciate you man. |
| WHITE: | Just trying to, and also trying to figure out what other new opportunities are coming. |
| CHS 1: | Yeah. |
| WHITE: | Because while we focus on this shit, we gotta keep... |
| CHS 1: | Keep moving, keep moving. |
| WHITE: | Yeah. So I end up talking to uh, I also talked to the Director DYRS, but he didn't know shit. He didn't know, he didn't know nothing. But I realized that he don't know nothing because [Government Employee 2] put people in his office to make sure his shit running. He just the name. |

67.     CHS 1 and WHITE next discussed the timing of an additional payment. Then WHITE exited the car.

## COUNT ONE
### (Bribery – 18 U.S.C. § 201)

68.     Paragraphs 1 through 67 of this Indictment are incorporated by reference as if fully stated herein, and the following is further alleged.

69.     From June 26, 2024, to August 18, 2024, in the District of Columbia, Defendant WHITE, being a public official, did directly and indirectly corruptly demand, seek, receive, accept, and agree to receive and accept anything of value, in return for being influenced in the performance of any official act; in return for being influenced to commit and aid in committing, and to collude in, and allow, any fraud, and make opportunity for the commission of any fraud, on the United States; and in return for being induced to do and omit to do any act in violation of his official

29

duties; that is, WHITE corruptly demanded, sought, received, accepted, and agreed to receive and accept approximately $156,000, and received and accepted $35,000 in the form of four cash payments in exchange for using his position as a D.C. Councilmember to assist Company 1 and Company 2 extend their contracts at the ONSE and DYRS for VI services.

(In violation of Title 18, United States Code, Sections 201(b)(2)(A), (B) and (C).)

A TRUE BILL:

FOREPERSON

MATTHEW M. GRAVES

ATTORNEY OF THE UNITED STATES
IN AND FOR THE DISTRICT OF COLUMBIA