**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No. 24-CR-406 (RC)** |
| **v.** | |
| **TRAYON WHITE, SR.** | |
| **Defendant.** | |

**GOVERNMENT'S OMNIBUS MOTIONS *IN LIMINE***

The United States of America respectively moves *in limine* for an order (i) to exclude certain evidence and argument; and (ii) to permit the presence of law enforcement witnesses during trial.  In support of its motion, the United States relies on the following points and authorities, and such other points and authorities as may be cited at a hearing on this motion.

**A.      BACKGROUND**

Trayon White, Sr. (the "Defendant"), serves as a Councilmember, representing Ward 8, on the Council of the District of Columbia. ECF No. 12 at ¶ 1. As relevant here, in 2024, the Defendant served as the Chairperson of the Committee on Recreation, Libraries and Youth Affairs, which oversees several agencies including the District of Columbia Department of Youth Rehabilitation Services ("DYRS"). *Id.* On September 5, 2024, a Grand Jury empaneled in the District of Columbia returned a one-count Indictment against Trayon White, Sr. (the "Defendant"), charging the Defendant with one count of bribery in violation of 18 U.S.C. § 201. This charge arises from an ongoing bribery scheme, in which CHS-1 offered, and the Defendant accepted, cash in exchange for using his official position to influence decisions impacting CHS-1's business with

various District of Columbia Government agencies beginning in 2019 and continuing to the time of Indictment.

### i.    White's Lawful Duties as a D.C. Council Member

As a public official and Councilmember in the District of Columbia, the Defendant had a lawful duty to perform his responsibilities consistent with the Council of the District of Columbia's Code of Official Conduct. *Id.* at 2. The Code of Official Conduct prohibited the Defendant from, among other things: (1) using his position to influence the outcome of a matter that he knows is likely to have a direct effect on his financial interests; (2) receiving any compensation, salary, or contribution to salary, gratuity, or any other things of value from any source other than the District Government for his performance of official duties; (3) soliciting or accepting, either directly or indirectly, any gift from a "Prohibited Source"; (4) receiving anything of value in return for being influenced in the performance of official acts; (5) knowingly using the prestige of his office or public position for his financial gain or that of another; and (6) disclosing or using confidential or privileged information acquired by their position without authorization. *See* Council of the District of Columbia's Code of Official Conduct §§ I (a), (e)(1); III (a), (e)(2); VI (b)(1); VII (1): *see also* ECF No. 12 at ¶ 2. Under the Official Code of Conduct, a "Prohibited Source" was defined as any person or entity that, among other things "has or is seeking to obtain contractual or other business or financial relations with the District Government." *Id.* at Council of the District of Columbia's Code of Official Conduct § III(g)(2)(A); *see also* ECF No. 12 at ¶ 3.

The Defendant was also required to file yearly financial disclosures and certifications which, among other things, confirm that they have: (1) complied with their duty to report known illegal activity, including attempted bribes, to the appropriate authorities; (2) not been offered or accepted bribes; (3) not directly or indirectly received government funds through illegal or

improper means; (4) not received or been given anything of value, including a gift or political contribution, based on any understanding that the councilmembers official actions or judgment or vote would be influenced; and (5) that they completed a full ethics training within the last year. *Id.* at ¶ 4. The Defendant filed these financial disclosures and certifications for 2017 through 2023, including on May 15, 2024. *Id.*

### ii.    The Bribery Scheme

### 1.    The Defendant Begins Taking Bribes from CHS-1

In 2019, the Defendant solicited and accepted a $20,000 bribe payment from CHS-1, in exchange for his help resolving a contract dispute involving one of CHS-1's company, Company 1. *Id.* at ¶ 25. Since 2016, Company 1 had a multi-year Human Care Agreement ("HCA"), with the District of Columbia, Department of Human Services ("DHS"). *Id.* at ¶ 17. As part of this agreement, Company 1 would provide case management services for chronically homeless and other highly vulnerable individuals and families experiencing homeless. *Id.* In accordance with the HCA, Company 1 was required to conduct criminal background checks on "[a]ll positions listed in the Provider's business plan having direct contact with children/youth." *Id.* On January 2019, DHS determined that the majority of the background check documents submitted by Company 1 to DHS were falsified – in other words, Company 1 was affirming it conducted background checks that it did not, in fact, do. *Id.* at ¶ 18.

On February 25, 2019, the DHS determined that Company 1 was in default of the HCA and, as a result, terminated the agreement. *Id.* at ¶ 19.  A lengthy dispute ensued. Several months later, on August 14, 2019, Company 1 submitted a claim to the D.C. Government's Office of Contracting and Procurement demanding $4,015,728, alleging that the HCA termination was improper and demanding that the termination for default be converted to a termination for

convenience. *Id.* at ¶ 20. On September 17, 2019, Company 1 lowered its monetary demand to $1,593,960, but ultimately, on December 12, 2019, the D.C. Government's Office of Contracting and Procurement denied Company 1's claim. *Id.* at ¶¶ 20-21. Company 1 subsequently appealed that denial, which the Contract Appeals Board dismissed. *Id.* at ¶¶ 22-23. As a result, Company 1 did not receive any payment. *Id.* at ¶ 24.

During this lengthy dispute, the Defendant solicited and accepted a $20,000 bribe payment from CHS-1. *Id.* at ¶ 25. Specifically, in exchange for the $20,000, the Defendant agreed to use his public position to pressure high ranking District of Columbia Government officials to resolve the dispute to CHS-1's benefit. *Id.* In July 2024, the Defendant acknowledged this prior $20,000 bribe payment. He stated to CHS-1: "I have to work and put everything in play. I am just trying to make sure… because… last time we was trying to do something like this… that shit messed up my relationship… because I was going… I ain't gonna lie because we was trying to get [Government Employee 1] to do something and he/she agreed to do it and he just never responded… and he just disappeared and stopped answering, even to this day." *Id.* at ¶ 26.

### 2.  2024 Acts in Furtherance of the Bribery Scheme

The bribery scheme continued in 2024, when the Defendant and CHS-1 met again to discuss various contracts CHS-1 had with the District of Columbia Office of Neighborhood Safety and Engagement (ONSE). ONSE was a D.C. Government agency established to address violence in the District of Columbia and to assist families dealing with the grief and trauma caused by such violence. *Id.* at ¶ 7.  In 2018, the ONSE launched the Violence Intervention (VI) Initiative, a collaborative community engagement strategy designed to assist District of Columbia residents reduce gun-related violence in their communities. *Id.* at ¶ 8. The ONSE contracted and partnered with community organizations to build partnerships with community members, including with two

of CHS-1's associated businesses, Company 1 and Company 2. *Id.* at ¶¶ 8, 14-15. As part of the ONSE's VI Initiative, Company 1 contracted with the District of Columbia Government to provide VI services in Wards 1 and 4 in the District of Columbia and Company 2 contracted with the District of Columbia Government to provide VI services in Ward 5 of Washington, D.C. *Id.* at ¶¶ 14-15.

On June 26, 2024, CHS-1 and the Defendant met in CHS-1's car. *Id.* at ¶ 27.  During the meeting, CHS-1 and the Defendant discussed the VI contracts that Company 1 had with the ONSE: CHS-1 reminded the Defendant that CHS-1's companies had large contracts with the District of Columbia Government, and CHS-1 asked the Defendant to ascertain whether those contracts would be renewed. *Id.* at ¶ 28. CHS-1 then told the Defendant that he had $15,000 for him and gave the Defendant an envelope containing $15,000 in cash. *Id.* Initially, the Defendant stated: "what you need me to do, man? I don't, I don't wanna feel like you gotta gimme something to get something. We better than that." *Id,* But the Defendant put the envelope containing the money into his jacket pocket and never attempted to return the money. *Id.*

CHS-1 and the Defendant then discussed the specific tasks that CHS-1 wanted the Defendant to perform, including meeting with Government Employee 2, to "get an idea" of what would happen with CHS-1's contracts. *Id.* at ¶ 29. The Defendant stated: "So you trying to get an idea where they gonna go with the contracts?" *Id.* CHS-1 confirmed that was the information he needed, and then proposed that they meet again in two weeks. *Id*. CHS-1 told the Defendant that he would pay the Defendant for his assistance with the contracts: "you know, we link up I guess another two weeks. But like I was telling you, I'm be able to keep hitting you off. You know what I mean?" *Id.* at ¶ 30. While saying this, CHS-1 made a gesture with his hands mimicking giving money to the Defendant. The Defendant responded: "Yea." *Id.*

CHS-1 went on to ask the Defendant to determine the status of CHS-1's company's contract with the ONSE and then told the Defendant that: "It's cool, in two weeks, we can go over everything, go over your whole plan." *Id.* at ¶ 32. "But if you can, definitely man, that's for you, so definitely please take, please, please use that to take care of the stuff for [Government Employee 3]. You know what I mean?" *Id.* To which the Defendant responded, in part, "Yea." *Id.* CHS-1 and the Defendant concluded their meeting with a discussion of other opportunities for the Defendant and CHS-1 to work together, where the Defendant would assist CHS-1 in securing contracts with the District of Columbia Government. *Id.* at ¶ 33.

CHS-1 and the Defendant met again several weeks later, on July 17, 2024, in CHS-1's car. *Id.* at ¶ 34. The Defendant updated CHS-1 on his efforts to pressure the ONSE and DYRS to extend their grants to Company 1 and Company 2. *Id.* at ¶ 35. CHS-1 offered, and the Defendant accepted a kickback of 3% of each grant's value in exchange for the Defendant agreeing to pressure the ONSE and DYRS to extend their grants to Company 1 and Company 2. *Id.* During that meeting, the Defendant reported that he had followed up with Government Employee 2 but that he/she was not very helpful. *Id.* at ¶ 36. To circumvent Government Employee 2, the Defendant said that he had contacted two DYRS employees who oversaw certain DYRS grants. *Id.* The Defendant then stated he was in contact with Government Employee 4 and that he was scheduled to meet with him/her later that day. *Id.*

CHS-1 also showed the Defendant a ledger, listing all of Company 1's and Company 2's grants from D.C. Government agencies, the total value of each grant, and the Defendant's corresponding 3% cut:



*Id.* at ¶ 37. Using the ledger as a guide, the Defendant and CHS-1 went on to discuss the individual

contracts. *Id.* at ¶ 38. During that discussion, the Defendant mentioned two District of Columbia

Government employees he intended to meet, Government Employee 3 and Government 4, to help

secure contracts for Company 1 and Company 2. *Id.*

Later in the conversation, CHS-1 again referenced the ledger listing the contracts and

payments:

CHS-1:          Are these all agreeable to you?

The Defendant:          Gave me. Yeah. You gave me… I mean we, we good, we can worry

about the money later. This issue is, stay on, stay on mission… make sure we still can…keep

everybody. Keep everything afloat cause…

> CHS-1:          But if you need anything, I can meet you back in an hour.
>
> The Defendant:    Yeah. I'm hurting. I've been hurting for a minute.

*Id.* at ¶ 41. After the Defendant said that he was "hurting," CHS-1 agreed to meet the Defendant in an hour to give him another cash payment. *Id.* Approximately an hour later, CHS-1 returned to the location of his last meeting with the Defendant. *Id.* at ¶ 45. CHS-1 asked the Defendant, if they met again in a few weeks, how much money the Defendant would want. *Id*. The Defendant responded: "Let's play it by ear because I don't really got no real demand at the moment. I got to work to put everything in play… So I just want to put everything in place, so I can put everything in motion." *Id.*

CHS-1 then handed the Defendant an envelope with the $5,000, that the Defendant had requested. *Id.* at ¶ 46. CHS-1 said: "that's for, making sure you reach out to [Government Employee 3] and [Government Employee 4]." *Id.* The Defendant responded: "I am on top of all that... you know me, I'm already moving. I'm going to put …Once you and I lock eyes and gets to an understanding, I gets to work. I can start making some shit happen." *Id.* The Defendant then referenced his meeting with Government Employee 4 later that day and meeting with Government Employee 3 the next day. *Id.* CHS-1 and the Defendant then discussed additional bribe payments. CHS-1 told the Defendant to let him know how much he wanted and CHS-1 would provide it. *Id.* at ¶ 47.

On July 19, 2024, the Defendant kept CHS-1 informed about his progress, telling him that he had a meeting with two high-ranking government officials to facilitate obtaining new contracts for CHS-1. *Id.* at ¶¶ 48-50. Five days later, the Defendant texted CHS-1, asking to meet. *Id.* at ¶ 51. The Defendant wanted to update CHS-1 on his progress facilitating the renewal of Company 1's and Company 2's contracts with the District of Columbia Government. *Id.* The Defendant also

wanted to receive another payment. *Id.* The Defendant specifically requested that CHS-1 "bring 10." *Id.* When CHS-1 responded that he could only give him "5," the Defendant responded: "Please do 10. I have to keep my word." *Id.* The Defendant and CHS-1 met in the Defendant's car again the next day. *Id.* at ¶ 52. After entering the car, the Defendant said: "I feel good energy about what we embarking on, what we trying to do. I want to bring you up to speed before we go in here about stuff I've been working on, trying to get you where you need to be." *Id.* at ¶ 53. The Defendant then proceeded to update CHS-1 about conversations he had with Government in furtherance of the bribery scheme and the Defendant and CHS-1 once again discussed that the Defendant would receive a 3% cut of the total amount of each grant CHS-1's companies received. *Id.* at ¶¶ 58. At the end of the meeting, the Defendant accepted an envelope with $10,000. *Id.* at ¶ 58-59.

After sending several updates to CHS-1 on his progress meeting with District of Columbia Government employees, *Id.* at ¶ 60-61, the Defendant and CHS-1 met in CHS-1's car again on August 9, 2024, *Id.* at ¶ 62. During that meeting, the Defendant provided an update on the status of his efforts to pressure government employees to renew CHS-1's contracts. *Id.* at ¶ 64. After the update, CHS-1 then handed the Defendant an envelope containing the "half" $5,000 in cash. *Id.* at ¶ 65. As he gave the cash to the Defendant, CHS-1 stated that the payment was because "I know you've been handling your business." *Id.* The Defendant responded "Yeah." *Id.* Before exiting the CHS-1's car, the Defendant and CHS-1 discussed the timing of an additional payment. *Id.* at ¶ 67.

**B.    LEGAL STANDARDS**

"To the extent practicable, the court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means." Fed. R. Evid. 103(d); *see also United States v. Young*, 470 U.S. 1, 10 (1985) ("[T]he trial judge has the responsibility to maintain decorum in keeping with the nature of the proceeding; the judge is not a mere moderator, but is the governor of the

trial for the purpose of assuring its proper conduct.") (internal quotations omitted).  In service of this responsibility, the Court has broad discretion to determine whether evidence or argument can properly be presented at trial.  *See United States v. Morgan*, 581 F.2d 933, 936 (D.C. Cir. 1978) ("The district court has wide discretion to admit or exclude evidence where the question is one of relevancy or materiality"); *United States v. Tarantino*, 846 F.2d 1384, 1410 (D.C. Cir. 1988).  This includes excluding evidence or argument whose only purpose is to encourage the jury to nullify.  *See United States v. Gorham*, 523 F.2d 1088, 1097-98 (D.C. Cir. 1975) (affirming trial court's exclusion of evidence relevant only to jury nullification) (citing *Sparf v. United States*, 156 U.S. 51, 106 (1895); *United States v. Boone*, 458 F.3d 321, 329 (3d Cir. 2006) ("[A] juror . . . who commits jury nullification violates the sworn jury oath and prevents the jury from fulfilling its constitutional role.").

Motions *in limine* assist the Court in serving its gate-keeping function to keep incompetent evidence or improper argument from the jury by permitting it exclude it in advance of trial.  *United States v. Zeese*, 437 F. Supp. 3d 86, 92 (D.D.C. 2020) (quoting *United States v. Jackson*, 627 F.2d 1198, 1209 (D.C. Cir. 1980) ("Pretrial motions in limine effectuate [Rule 103(d)'s] directive" that inadmissible evidence not be suggested to the jury by any means, and a "'pre-trial ruling, if possible, may generally be the better practice, for it permits counsel to make the necessary strategic determinations").  Here, the Court has a sufficient basis to rule in advance of trial to exclude improper evidence and argument so that it is not suggested to the jury in any way.

## C.    EVIDENCE AND ARGUMENT THAT SHOULD BE EXCLUDED FROM TRIAL

### I.    The Court should preclude the defendant from arguing or suggesting that he was entrapped by law enforcement.

The Government has reason to believe that the Defendant will argue that he was entrapped by law enforcement. Since the Defendant's arrest in this case, he or people around him have

suggested that the FBI set him up. For example, during a January 28, 2025, public hearing on the

Defendant's expulsion from the D.C. Council, a truck sat outside the Wilson Building with a

picture of the Defendant and letters stating, "FBI Set Me Up."



At that hearing, the Defendant wore a shirt stating, "The FBI Killed Fred Hampton."



And on August 8, 2025, the Defendant made a statement during his swearing in where he said,

"You know the FBI is after me, you know, but I believe that you know, not just arrest me, but you

know but I believe they want to kill me."[1] Here, the Defendant cannot meet a prima facie showing

of entrapment and thus should be precluded from making any argument—express or implied—

---

[1] *DC councilmember Trayon White claims the FBI is trying to kill him*, Aug. 8, 2025, available at
https://wjla.com/news/local/trayon-white-fbi-investigation-claims-killing-alleged-bribery-
scheme-undercover-dc-council-ward-8-contracts-legal-issues-ethics-trial-informant-special-
election-win-removed-fear-god-conspiracy-theory (last accessed Sept. 2, 2025)

that he was entrapped by law enforcement.

When defense seeks to raise a defense of entrapment, "the controlling question is whether government agents 'implant[ed] in the mind of an innocent person the disposition to commit the alleged offense and induce[d] its commission in order that they may prosecute." *United States v. McKinley*, 70 F.3d 1307, 1311–12 (D.C. Cir. 1995) (quoting *Sorrells v. United States*, 287 U.S. 435, 442 (1932)). The D.C. Circuit follows a bifurcated approach to entrapment: "[1] once a defendant meets his burden of proving that the government persuaded him to commit a crime, [2] the government must prove beyond a reasonable doubt that the defendant was ready and willing to do so." *United States v. Whoie*, 925 F.2d 1481, 1485 (D.C. Cir. 1991). "Although these questions of fact are within the purview of the jury, a trial judge need not give an entrapment instruction if there is no evidentiary foundation for a finding of government inducement, *i.e.*, if the defendant has not come forward with some evidence of government inducement." *McKinley*, 70 F.3d at 1312 (internal citations omitted).

"The government's behavior amounts to inducement when it was 'such that a law-abiding citizen's will to obey the law could have been overborne.'" *United States v. Glover*, 153 F.3d 749, 754 (D.C. Cir. 2018) (quoting United States v. Kelly, 748 F.2d 691, 698 (D.C. Cir. 1984)). Mere solicitation by the government for the defendant to commit a crime, to which he readily acquiesces does not amount to inducement. *McKinley*, 70 F.3d at 1312; *see also United States v. Mayfield*, 771 F.3d 417, 432 (7th Cir. 2014) ("Where the government's agents merely initiate contact with the defendant, solicit the crime, or furnish an opportunity to commit it on customary terms, the government has not 'induced' the crime within the meaning of the entrapment doctrine and the defense should be unavailable without the need for a more complex inquiry into evidence of predisposition."). Instead, to establish inducement, the defense must produce evidence that the

solicitations to commit the crime are coupled with overtures, such as "persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship." *United States v. Sanchez*, 88 F.3d 1243, 1249 (D.C. Cir. 1996); *see also United States v. Ramos-Paulino*, 488 F.3d 459, 462 (1st Cir. 2007) ("Inducement requires something more—something akin to excessive pressure, threats, or the exploitation of an unfair advantage."). Importantly, the typical reward or benefit inherent to the crime is not sufficient, by itself, to establish inducement. *McKinley*, 70 F.3d at 1314; *see also United States v. Ellis*, 23 F.3d 1268, 1273 (7th Cir. 1994) ("If the ordinary profits of crime as offered by the government agent are what induced the defendant to commit the crime, that defendant has not been entrapped.").

Here, the Defendant was plainly not induced. As described in the indictment, and in more detail above, CHS-1 had a prior relationship with the Defendant. *See* ECF No. 12 ¶¶ 17–26. CHS-1 will testify that prior to any involvement of the Government, CHS-1 paid a $20,000 bribe to the Defendant in exchange for his assistance in resolving a contract dispute between CHS-1 and the District of Columbia Government. *Id*. ¶¶ 17–26. Moreover, as noted, during one of the recorded bribe payments, the Defendant referred to the prior corrupt agreement between him and CHS-1. *See id.* ¶ 26 ("I have to work and put everything in play. I am just trying to make sure . . . because . . . last time we was trying to do something like this . . . that shit messed up my relationship . . . because I was going . . . I ain't gonna lie because we was trying to get [Government Employee 1] to do something and he/she agreed to do it and he just never responded… and he just disappeared and stopped answering, even to this day.").

Because the Defendant and CHS-1 had this prior relationship, there was no resistance on the part of the Defendant when CHS-1—at the behest of the Government—sought to set up a meeting. On June 26, 2024, the Defendant and CHS-1 met outside of the Defendant's apartment.

*Id.* ¶ 27. As described in the Indictment, CHS-1 discussed obtaining the Defendant's assistance in ascertaining whether his contracts with the ONSE would be renewed. *Id.* ¶ 28. CHS-1 then told the Defendant that he had $15,000 for him and gave the Defendant an envelope containing $15,000 in cash. *See* Ex. 1. The Defendant immediately placed the envelope into his jacket pocket and then stated "what you need me to do, man? I don't, I don't wanna feel like you gotta gimme something to get something. We better than that." *Id.* However, the Defendant never removed the money or attempted to give the money back. *Id.* Instead, the conversation turned to the specifics tasks CHS-1 wanted the Defendant to engage in—to which he readily agreed. *Id.* In fact, when CHS-1 told the Defendant that he could continue to do "something like this twice a month . . . for the next 90 days," the Defendant responded, "I've got other shit we can be doing too." *Id.* The Defendant suggested that CHS needed "to start thinking about [] how we gent into the mental health space." *Id.*

CHS-1 and the Defendant continued to meet, and the Defendant continued to readily accept bribe payments. On July 17, 2025, the Defendant described himself as "hurting," and since CHS-1 did not have the cash to make an immediate payment, the two agreed to meet up later in the day. ECF No. 12 ¶ 41. At that later meeting, the Defendant accepted $5,000 with no resistance and CHS-1 indicated that the Defendant could let him know how much he wanted for future meetings. Ex. 2. Beginning on July 19, 2024, the Defendant began telling CHS-1 that he needed to meet with him urgently. Eventually, a meeting was set up for July 25, 2024, and the Defendant specifically requested $10,000 via text message. When CHS indicated that he could only do $5,000, the Defendant stated, "Please do 10. I have to keep my word."



Pursuant to the Defendant's request, CHS-1 provided $10,000 during the July 25, 2024, meeting, which the Defendant readily accepted.

A final bribe was paid to the Defendant on August 9, 2024. The day before CHS-1 texted the Defendant to setup a meeting to get an update on the status of the contract renewals. CHS-1 asked the Defendant if he needed him to "bring anything." He initially responded: "Let me check on that in an hour when I wrap up this meeting." But the Defendant later texted: "Nothing is needed unless you're feeling generous lol." CHS-1 responded: "I'm definitely feeling generous if we got project 1 and 2 on lock tomorrow." "Project 1" and "project 2" were references to CHS-1's contracts with the D.C. Government. The Defendant responded: "I haven't seen anything in writing, but from what I'm being told you should be good on both." CHS-1 responded: "If you knock it out the park I got you. What sounds to you." On August 9, 2024, the Defendant responded, "Can you do half," meaning $5,000.

 

The Defendant and CHS-1 did meet on August 9, 2024. After providing an update on his efforts to pressure government employees to renew CHS-1's company's contracts, the Defendant accepted an envelope containing the $5,000 in cash. As he gave the cash to the Defendant, CHS-1 stated that the payment was because "I know you've been handling your business." the Defendant responded "Yeah." CHS-1 then confirmed that he had just listed the people whom the Defendant had promised to pressure "[b]ut I you just went down the list to everybody." the Defendant then stated, "Yeah man. I'm gonna do mines." Ex. 3.

On these facts, no reasonable jury could find that the Government induced the Defendant because no reasonable jury could find that his will to obey the law was overborne. *See Glover*, 153 F.3d at 754. CHS-1 exerted no coercion and made no threats towards the Defendant. The only reward offered was that inherent to the crime—the bribe payment itself. CHS-1 met no resistance. In fact, the Defendant repeatedly asked for additional money. While the Defendant initially said

"I don't wanna feel like you gotta gimme something to get something," he did so just *after* the money was already in his pocket. CHS-1 did not have to persuade him any further. Instead, the conversation moved to the specifics of the official acts the Defendant would agree to take, and the conversation ended with the Defendant suggesting additional lucrative schemes that he could help CHS-1 with. The Defendant showed no reluctance in accepting the additional bribes, and in fact, he began setting the price and on one occasion, even asked for more money than CHS-1 indicated he wanted to give. "It is well settled that the fact that officers or employees of the government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution." *Sorrells v. United States*, 287 U.S. 435, 441 (1932). Instead, "[t]o be inducement, the government's actions must have overpowered the defendant." *United States v. James*, 928 F.3d 247, 256 (3d Cir. 2019). Because no reasonable jury could find on these facts that the Government—through CHS-1—overpowered the Defendant, the Court should find that there is not sufficient evidence of Government inducement to support an entrapment instruction.[2]

## II.    The Defendant Should Not Be Allowed to Offer Evidence or Argument that May Lead to Improper Jury Nullification

Defendant should be precluded from arguing or seeking to admit evidence for the purpose of encouraging the jury to nullify its verdict; such argument and evidence is not admissible. *See United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983) ("A jury has no more 'right' to find a 'guilty' defendant 'not guilty' than it has to find a 'not guilty' defendant "guilty," and the

---

[2] The Government maintains that the Court can determine at this stage and as a matter of law that there is not sufficient evidence of Government inducement. However, should the Court wish to defer this determination until the evidence comes in at trial, the Court should prohibit the defense from arguing entrapment to the jury during voir dire, opening statements, or at any point at trial—unless and until the Court determines there is sufficient evidence to support an entrapment instruction. Should the defense state the term entrapment or allude to the same during trial, it would ring a bell that cannot be unrung. And the colloquial notion of entrapment will have been implanted in the jury's mind, even if the Court later rules—correctly—as a matter of law that entrapment cannot serve as a defense in this case.

fact that the former cannot be corrected by a court, while the latter can be, does not create a right out of the power to misapply the law.  Such verdicts are lawless, a denial of due process and constitute an exercise of erroneously seized power."); *see also United States v. Wilkerson*, 966 F.3d 828, 835 (D.C. Cir. 2020) *(*Federal courts have "categorically reject[ed] the idea that, in a society committed to the rule of law, . . . courts may permit [jury nullification of the law] to occur when it is within their authority to prevent" ) (quoting *United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997)); *United States v. Gorham*, 523 F.2d 1088, 1097-98 (D.C. Cir. 1975) (affirming exclusion of evidence sought to entice jury nullification and agreeing that introduction of the evidence "would have been unnecessarily confusing and potentially prejudicial"); *United States v. Moss*, 297 F. App'x. 839, 841 (11th Cir. 2008) (granting government motion *in limine* to exclude defense evidence "intended to inspire a jury to exercise nullification"); *United States v. Sepulveda*, 15 F.3d 1161, 1190 (1st Cir. 1993) ("[N]either the court nor counsel should encourage jurors to [nullify] . . . A trial judge, therefore, may block defense attorneys' attempts to serenade a jury with the siren song of nullification.").  For this reason, the Government moves to exclude the following evidence and argument – none of which is probative of an element of the charged offenses or an affirmative defense available to the Defendant.

### III. Selective Prosecution or Improper Government Motive Claims

The Court should prohibit the Defendant from encouraging jury nullification by challenging the Government's motivation for pursuing charges in this case or alleging selective prosecution.  Here, that may take the form of arguments on why the Government's operation targeted the Defendant, as opposed to other government officials. "The selective prosecution defense is an issue for the court to decide, not an issue for the jury." *United States v. Jones*, 52 F.3d 924, 927 (11th Cir. 1995).  In other words, because "[s]elective prosecution has no bearing

on the determination of factual guilt," such a claim must "be raised by pretrial motion." *United States v. Scrushy*, 721 F.3d 1288, 1305 (11th Cir. 2011); *see also United States v. Washington*, 705 F.2d 489, 495 (D.C. Cir. 1983) (finding that "the issue of selective prosecution is one to be determined by the court"). As of this filing, the Defendant has not filed such a motion—likely for good reason: any such claim would be baseless and would fail under the Supreme Court's "demanding" standard, which requires the Defendant to make a showing of both discriminatory intent and discriminatory effect. *See United States v. Armstrong*, 517 U.S. 456, 463 (1996).

## IV. The Defendant Should Not Be Allowed to Reference Punishment or Other Consequences to the Jury

The Court should preclude as irrelevant and prejudicial any reference to the Defendant's potential sentence during all phases of the trial, including jury selection, opening statements, examination of witnesses—to include the Defendant if he elects to testify—and summation. That reference could be as overt as, "You understand the defendant is facing multiple years in prison if convicted," or more subtle such as, "send him home," "make sure he goes home," "the defendant is facing a lot of time," "this case has serious consequences for the defendant," "the defendant's liberty is at stake in this trial," or "your decision will have consequences for a long time to come."

"It has long been the law that it is inappropriate for a jury to consider or be informed of the consequences of their verdict." *United States v. Frank*, 956 F.2d 872, 879 (9th Cir. 1992); *see United States v. Broxton*, 926 F.2d 1180, 1183 (D.C. Cir 1991) ("the jury is not to consider the potential punishment that could result from a conviction"); *see also Shannon v. United States*, 512 U.S. 573, 579 (1994) ("[P]roviding jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their fact-finding responsibilities, and creates a strong possibility of confusion"); *Rogers v. United States*, 422 U.S. 35, 40 (1975) (explaining the jury should have been admonished that it "had no sentencing function and should reach its

verdict without regard to what sentence might be imposed"). Mention of the potential penalties or other consequences faced by the Defendant—particularly potential penalties faced by a Defendant with minor children—would serve only the improper purpose of jury nullification. Therefore, the Defendant should be precluded from making any reference to punishment or the consequences of such punishment on the Defendant or his family.

### V.       The Court Should Preclude Defendant from Offering Evidence or Argument Regarding Defendant's Good Conduct

The Government anticipates that the Defendant may attempt to argue or introduce evidence of positive work the Defendant has done specifically in the field of violence interruption and for his ward more generally. The Government moves to preclude the Defendant from offering such evidence or argument regarding specific instances of non-criminal activity, as such evidence is inadmissible under Federal Rules of Evidence 404.

Federal Rule of Evidence 404(a)(1) provides that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." This rule means that "[e]vidence of a person's character is generally not admissible to prove that he acted in conformity therewith on a particular occasion." *Government of the Virgin Islands v. Grant*, 775 F.2d 508, 510 (3d Cir. 1985). The rule applies to prior good acts as well as prior bad acts of the Defendant: "[f]or the same reason that prior 'bad acts' may not be used to show a predisposition to commit crimes, prior 'good acts' generally may not be used to show a predisposition not to commit crimes." *United States v. Dimora*, 750 F.3d 619 (6th Cir. 2014). In other words, "evidence of good conduct is not admissible to negate criminal intent." *United States v. Ellisor*, 522 F.3d 1255, 1270 (11th Cir. 2008).

Rule 404(a) includes a limited exception for criminal defendants that does not apply here. Rule 404(a)(2) provides that a criminal defendant "may offer evidence of the defendant's pertinent

trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it." That exception does not apply in this case because any potential purported prior good acts are not relevant to any character trait that is "pertinent" to any of the charges against him. Here, any minimal probative value attendant to admitting evidence regarding conduct not at issue in this case would be substantially outweighed by the high likelihood of jury confusion and the risk of jury nullification. As such, the Defendant should be precluded from offering such evidence or argument.

**VI.    The Court Should Limit Cross-Examination of CHS-1 and Exclude Evidence of CHS-1's Irrelevant Criminal Cases**

In discovery, the Government disclosed various prior or active criminal and civil cases involving CHS-1, outside of the case where he pleaded guilty in connection with this case. They are outlined in Sealed Exhibit 4. Although disclosed in discovery, these are not proper grounds for cross-examination.

As an initial matter, CHS-1's only conviction outside of the case where he pleaded guilty in connection with this case is for a traffic offense—Stopping Vehicle in an Intersection. Such a conviction is plainly not proper grounds for cross-examination under Rule 609. *See* FRE 609(a)(2) (permitting cross-examination for convictions of misdemeanors only "if the court can readily determine that establishing the elements of the crime required proving – or the witness's admitting – a dishonest act or false statement"). Every other criminal case is either unresolved or has been dismissed and therefore have no bearing on CHS-1's credibility.

As to any allegations in the civil matters, they are just that—allegations. Defense should be absolutely precluded from introducing extrinsic evidence related to CHS-1's open contract dispute or his divorce/custody matter. *See United States v. Morrison*, 98 F.3d 619, 628 (D.C. Cir. 1996) ("The Federal Rules of Evidence expressly prohibit the use of 'extrinsic evidence' of a witness' conduct (except for certain types of criminal convictions) to impeach the witness." (Citing

Fed. R. Evid. 608(b)).  "Fed .R. Evid. 608(b) prohibits extrinsic evidence on cross-examination and thus crossexaminer is 'stuck with whatever response' the witness gives." *Whitmore*, 359 F.3d at 622 (quoting *United States v. Brooke*, 4 F.3d 1480, 1484 (9th Cir.1993)).  "The purpose of this rule is to prohibit things from getting too far afield – to prevent the proverbial trial within a trial." *Id.* at 618 (quoting *United States v. Bynum*, 3 F.3d 769, 772 (4th Cir.1993)); *see also United States v. Tarantino*, 846 F.2d 1384, 1409 (D.C. Cir. 1988) ("This rule serves to avoid confusion of the issues and undue extension of the trial." (Internal quotation marks omitted)).  If defense were to bring in evidence from any of CHS-1's civil cases, it would invite exactly the kind of trial within a trial, a litigation of an irrelevant, collateral issue, that Rule 608(b) seeks to prevent.

Accordingly, the Government requests that the Court order *in limine* that defense is precluded from cross-examining CHS-1 on any civil or criminal matters outside of case 24-CR-368 where he pleaded guilty in connection with this case.

### VII.   The Court Should Preclude the Introduction of Interview Reports to Impeach Witnesses Who Did Not Draft or Review Such Reports

The Government has provided a broad set of materials to the Defendant in this case, including interview reports for the Government's anticipated witnesses at trial.  The defense should be limited to using those interview reports consistent with the law and rules of evidence.  In particular, the defense should be precluded from introducing the contents of the interview reports to impeach witnesses based on inconsistent statements because the reports are not the statements of the witnesses themselves.  *See United States v. Leonardi*, 623 F.2d 746, 757 (2d Cir.1980) (holding that because "the written statement of the FBI agent was not attributable to [the witness]" it was "properly rejected as a prior inconsistent statement").  Moreover, the defense should be precluded from publishing the contents of the interview reports to the jury, or otherwise suggesting to the jury that a report is a statement of the witness.  *See United States v. Tones*, 759 F. App'x

579, 585 (9th Cir. 2018) (finding the district court did not abuse its discretion in declining to admit statements of two cooperating witnesses in law enforcement reports that they had not seen to impeach them); *United States v. Brika*, 416 F.3d 514, 529 (6th Cir. 2005), *abrogated on other grounds by United States v. Booker*, 543 U.S. 220 (2005) (holding that "[s]uch documents [i.e., interview reports] have been deemed inadmissible for impeaching witnesses on cross-examination because they represent the investigator's selections, interpretations and interpolations"); *United States v. Hill,* 526 F.2d 1019, 1026 (10th Cir. 1975) (upholding the trial court's decision to "not allow counsel to use the 302 statement to impeach a witness because the witness did not prepare or sign the document and probably never adopted it").

**VIII.    The Court Should Preclude the Defendant from Offering His Own Out-of-Court Statements**

The Court should preclude the Defendant from offering his own out-of-court statements in his case or through cross examination of other witnesses. "While the Federal Rules of Evidence set forth various exceptions to hearsay, self-serving hearsay is not one of those." *United States v. Michael Jabaar Wilkins*, No. CR 19-390 (RC), 2021 WL 1894990, at *5 (D.D.C. May 11, 2021) (citing *United States v. Rivera-Hernandez*, 497 F.3d 71, 82 n.5 (1st Cir. 2007)) ("To be received in evidence an admission . . . must be contrary to that party's position at the time of the trial."). Thus, the Defendant should not be permitted to circumvent the general prohibition on introducing self-serving, out-of-court statements by leaning on the rule of completeness, state of mind hearsay exception, or claiming his statements constitute non-hearsay.

**D.    THE TESTIFYING AGENT SHOULD BE PERMITTED IN THE COURTROOM THROUGHOUT THE TRIAL**

The Government intends to have a case agent present in the courtroom throughout the trial. The case agent also anticipated to testify. His presence at trial is essential to presenting the Government's case given his unique knowledge of the evidence and underlying investigation.

Thus, the Government requests that the case agent be exempted from any general order of sequestration pursuant to Federal Rule of Evidence 615, as is permitted. *See United States v. Abu Khatallah,* No. 4-cr-00141 (CRC), 2017 WL 11494061, at \*2 (D.D.C. Sept. 28, 2017) (allowing FBI agent to be present during trial).

In contrast, nonparty witnesses should be excluded from the courtroom during trial. Pursuant to Federal Rule of Evidence 615, "[a]t a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony.  Or the court may do so on its own." *See United States v. Geder,* 425 U.S. 80, 87 (1976) (noting trial court's "broad power to sequester witnesses before, during, and after their testimony").  Any witness on the Government Witness List, other than the case agent, and any witness on Defendant Witness List should be excluded from the proceedings.

E.    **CONCLUSION**

For the foregoing reasons, the Court should grant the Government's motion.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

*/s/ Joshua Gold*
Joshua Gold
Tx Bar No. 24103101
Rebecca G. Ross
N.Y. Bar No. 5590666
Assistant United States Attorneys
601 D Street, N.W.
Washington, D.C. 20539
(202)815-8965
Joshua.Gold@usdoj.gov