**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,       .
                                .
          Plaintiff,            .   CR No. 24-0406 (RC)
                                .
     v.                         .
                                .
TRAYON WHITE, SR.,              .   Washington, D.C.
                                .   Wednesday, February 25, 2026
          Defendant.            .   10:00 a.m.
. . . . . . . . . . . . . . . . .

**TRANSCRIPT OF MOTION HEARING**
**BEFORE THE HONORABLE RUDOLPH CONTRERAS**
**UNITED STATES DISTRICT JUDGE**

<u>APPEARANCES</u>:

For the Government:          JOHN CRABB, JR., AUSA
                             REBECCA G. ROSS, AUSA
                             U.S. Attorney's Office
                             601 D Street NW
                             Washington, DC 20530

For Defendant:               WARREN G. KOHLMAN, ESQ.
                             1845 R Street NW
                             Suite 550
                             Washington, DC 20009

Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

DEPUTY CLERK:  This is criminal action 24-406, United States versus Trayon White.  Counsel, please approach the podium and state your appearances for the record.

MR. CRABB:  Good morning, Your Honor.  John Crabb and Rebecca Ross for the United States.

THE COURT:  Good morning.

MR. KOHLMAN:  Good morning, Your Honor.  Gary Kohlman, counsel for Mr. White.  Your Honor, Mr. White is, as we speak, is doing a speech in front of a group of high school students and will be here shortly.  The government -- I proposed that we go forward and the government doesn't seem to object to that.

And I take responsibility, frankly.  He called me about 9:30 and said that the speaking engagement was running late and I said I would bring it up with you.  So I'm prepared to offer to the court a waiver of his presence.  And he will show up; it's just a matter of when.

THE COURT:  And he has agreed to that waiver?

MR. KOHLMAN:  Yes, sir.

THE COURT:  All right.  I will go ahead and waive.  All right.  Well, first let me ask, Ms. Ross are you still going to trial in front of Judge McFadden?

MS. ROSS:  As of today we are, Your Honor.  We have extended a plea with a deadline of Monday.  If the court is

amenable to it, if the plea agreement is accepted, I would be happy to reach out to the court and ask for an earlier trial date.

THE COURT: Okay. Let's do that.

MS. ROSS: I will keep you posted. Thank you, Your Honor.

THE COURT: All right. I've read all the pleadings. They're pretty straightforward, but I'll let the parties add whatever they wish and answer the few questions I have. Since the government filed its omnibus motion first, why don't we start with the government, and then we'll move on to the defendant's motions.

MR. CRABB: Your Honor, in light of the court's brief comments, is there any part of the motion in limine that the court would like us to focus on? Any particular questions?

THE COURT: The main question I have is on the entrapment issue. Your footnote, you know, if we do something like that, the devil's in the details and exactly how did you envision restricting the defendant during trial from raising the entrapment issue? How do you envision the details of that?

MR. CRABB: Your Honor, I apologize. I'm handling all the omnibus motion except for that aspect. Ms. Ross is handling that part.

THE COURT: All right. Ms. Ross. You just gave him

the easy ones?

MS. ROSS:  Exactly.  The brains behind the operation had to take the harder one of that.

Your Honor, in terms of the entrapment defense, the case law is very clear that absent some sort of proffer that there is evidence to support an entrapment defense, the defendant is not allowed to raise it.  Pursuant to Rule 103, that means throughout the duration of the trial.  So even during questions during voir dire, not allowed to hint at in any way during opening statements, at any point throughout the trial.

THE COURT:  I understand that.  But what exactly does that mean in a real-life trial?  If I were to restrict them from using the word "entrapment," what else would that restrict?

MS. ROSS:  So certainly in its -- the government isn't pulling this out of thin air.  The defendant has been very public about the fact that the FBI set him up and has made many comments to that effect.  So certainly any sort of insinuation that the FBI in any way set him up or coerced him into this criminal act that's alleged here would be off limits.

And certainly Mr. Kohlman's experienced defense counsel. He knows the type of statement that goes towards an entrapment defense.  So we would ask that if there's any sort of question or statement that defense counsel intends to make that even

hints at, or there's any question that it would hint at an entrapment defense, that he clear it with the court.

THE COURT:  But in order for me to make the determination that he is or is not entitled to an entrapment defense, he obviously has to have been allowed to elicit that evidence.  So where do you draw the line between what is evidence to convince me to give that defense, and what you think is prohibited?

MS. ROSS:  I think what's important to note is that defense counsel has not proffered that he has any evidence of an entrapment defense.  Certainly, if he does and he doesn't want to share that with the government right now, we would be amenable to an ex parte proffer to that.  But certainly he has not and the government does not believe he has any evidence, given what we have proffered about why this was not entrapment, to suggest that he was entrapped.

So I think if there is some sort of evidence as to the fact, then certainly there may be some questions or some line to elicit that argument here, but he has not proffered any so it's the government's position that it should all be off limits at this point, and should defense counsel even hint an entrapment defense or contemplate that, anything that elicits that, it should be cleared through the court first.

THE COURT:  What little the defense has hinted at goes to the relationship between the councilman and the cooperator.

Certainly if he's going to make some sort of argument that there's a special relationship here that overbore his will in some way, he has to be able to elicit that sort of testimony, right?

MS. ROSS:  I think it's a thin line, Your Honor.  And I agree that to the extent it goes into the background of their relationship, but certainly I don't think he's proffered any specific evidence to suggest that in any way that relationship or anything in the background of that relationship overbore his will, you know, his will to abide by the law.

So while the background is of course relevant here, again, I don't think he has proffered anything in particular about that background that even goes towards entrapment or to any sort of coercion here.  Again, if there is evidence to that, we are certainly not aware of it, we have not been told of that, and so again, we think at this point it's not even a close call, that anything that sort of hints at that should be cleared through the court first.

THE COURT:  Now, he argues that not every discussion between them was recorded.  Is that right?

MS. ROSS:  Your Honor, every bribe payment was recorded.

THE COURT:  Not the 2019.

MS. ROSS:  Not the 2019, that's correct, Your Honor. Not the 2019.  Every bribe payment in 2024 was recorded.  We

anticipate that the CHS will testify that there were select phone calls that he could not record, and he will tell the jury why, but what we anticipate the CHS testifying is that none of those were substantive.  So they did not talk about the bribe at all, they were more about coordinating meetings and things like that.

THE COURT:  All right.  But he is obviously going to try to draw -- try to get the jury to draw different inferences as to why those weren't recorded, which gives him some latitude as to where -- you know, what took place and what was at issue and what the relationship was.  So, all right.  Any other points you want to make on that?

MS. ROSS:  Just on that minor point, Your Honor, again, sure, that is -- of course will be the defendant's goal in cross-examining the CHS.  But again, I think the case law is very clear that no evidence of entrapment should be allowed unless there's proffered evidence to that.  And certainly there's no evidence as of now about what occurred on those calls.

So I just think if there is any latitude, it should be very minor.  I think the questions should be cleared through the court so they do not cross that line.  And I just want to make that point.

THE COURT:  All right.  Mr. Crabb, do you want to make any points on any of the other motions?

8

MR. CRABB:  No, Your Honor, not unless the court has any questions or concerns.

THE COURT:  I don't have any.

MR. CRABB:  Thank you.

THE COURT:  Thank you.  Mr. Kohlman, why don't we start with opposing their motion.

MR. KOHLMAN:  Yes, Your Honor.  I guess I just have to comment on how extreme I think the government's position is. And let me give you an analogy.  I tried back in my earlier days lots of self-defense cases.  To get a self-defense instruction, as the court knows, you need, quote-unquote, some evidence.  It's not a preponderance.  It's not a very high burden.

I frankly can't imagine a trial that would start with the government trying to preclude the defense attorney and the defense from putting their client on the witness stand and having him or her describe what happened when the victim, the complaining witness approached them, what their state of mind was, how they thought that they saw a knife perhaps in the person's pocket and how they acted in terms of responding to that confrontation.  That would be evidence that would be brought out in opening statement.

And to be clear, by the way, the government makes a reference that we can't argue entrapment in voir dire, in opening statement.  Of course we're not going to be arguing

it.  Voir dire is not a time for argument, and opening statement is not.  But I can't imagine a trial that would start in which you would preclude -- you would already have a minitrial and require a proffer before the defense attorney could confront the alleged victim and put on their case.

In this case, I could see -- I mean, frankly, I think the word "entrapment" should be used in voir dire.  And what I mean by that is there are citizens, lay people, who have a negative reaction to the word "entrapment," and I think the defense is entitled to know that during voir dire.

It is so easily cured -- let's assume you went down my path.  It is so easily cured at the end of the case by the court instructing the jury, you heard the word "entrapment," ladies and gentlemen, that is not part of this case and you're not to consider it.  And that is just kind of a traditional 101.  And jurors, as you know, respond to that.

I'm not going to go to the last ditch in fighting that we should be able to mention the word "entrapment" in voir dire, although I think frankly we should be able to.  But I cannot see any basis whatsoever for the court disallowing us to bring out both in opening statement facts, and the facts, by the way, include what you were alluding to.  In their own description of entrapment, they talk about the prior relationship between the confidential source and the accused.

And that's in their own papers, entrapment.  In their own

papers they talk about financial inducements and rewards as part of what a traditional entrapment defense would be.  But you already know those are part of it.  We made a supplemental pleading that I know you read that talked a little bit about what the background is between the two.

And I guess my overarching point is that this is certainly not the time or place to be deciding whether or not the defendant should have an entrapment defense.

And let me be candid and put all the cards on the table in front of the court.  There's a basis for it, for sure.  Are we actually going to ride that horse at the trial?  This is not -- to me this is not the time or place for even the defense to be having to decide that for sure.  It's certainly something we're contemplating.  It's certainly something we're investigating.  It's certainly something we're litigating and researching.

But I'm not committing necessarily that that would be the horse that Mr. White is going to ride at the trial in the first instance.  My position very strongly is let's see what the facts and how they unfold.  Let me talk about in good faith what the facts are between the relationship between the complaining witness and Mr. White.  Let the court listen as it will to the cross-examination of the confidential source, the cooperator.

If there is a defense case in terms of Mr. White, which of

course as the court knows this is not a time for me to be committing one way or the other, listen to that testimony, and then the court will have in front of it all the evidence it needs to make a decision as to whether the defense has come up with quote-unquote some evidence.  And again, that's all it takes in an entrapment defense.

I don't see anything other than mischief if the court goes further with what the government is suggesting here in terms of trying now, months before the trial, to make a ruling as to whether we've met that threshold.  So that's where we are.

THE COURT:  All right.  With respect to any of the other issues they raise in their omnibus motion, do you want to make any --

MR. KOHLMAN:  I think we can take care of those pretty quickly.  There's a reference to not wanting the defense to misuse what are euphemistically called FBI 302s.  Of course we're not going to misuse them.  But I want the door to swing in two different directions.  When we confront the cooperator on the witness stand, he will be confronted with statements that he made that are chronicled in the 302s.  Of course I'm not going to misuse them by approaching him with a 302 as he didn't author them -- unless he used them to refresh recollection, don't know one way or the other on that -- but I do want an understanding that the FBI agents who authored the 302s are available in case I want them available to complete

the impeachment.

I mean, I understand in other words their legal point that the document in and of itself, unless it was used for refreshing, can't be used to impeach, but other than that.

They also make a reference to the fact that Mr. White should not be able to put on character testimony.  And I would encourage the government to take a look at *Michaelson*, written by Justice Jackson back in 1948, '49, saying that in fact for a hundred years it's been recognized that a defendant can be acquitted on the basis of character evidence alone, that that can be the basis for reasonable doubt.

Again, it's too early for us to tell you what witnesses we have, but certainly I'm contemplating having witnesses who will be able to give generic character testimony.  And so I don't think this is the time the court has to necessarily make a ruling on that.  But at the pretrial, if I identify witnesses along those lines, I certainly anticipate the possibility of calling witnesses to address character testimony.

I think that that's the only other -- if the court will indulge me for a moment.

(Pause.)

No, that's it.  I think otherwise their motion's been joined by what has been filed already.  Thank you.

THE COURT:  All right.  You guys can have a chance to

reply and then we'll go to the defendant's motions.

MR. CRABB: Ms. Ross has authorized me to speak.

So, Your Honor, if I could briefly address two of the issues raised by the defense. Obviously not the entrapment and the potential impeachment and the character evidence.

If we understand what the defense is saying, we agree, we understand of course any witness could be confronted if there's a good-faith basis to believe they said something on a different occasion which is inconsistent with the trial testimony. But since a 302 is almost certainly not Jencks and I don't believe any in this case are, as the defense has said, to complete the impeachment it's not using the document itself, it's to call the person, namely the agent who was present and can testify as to what the previous statement was. So if we're understanding defense position, we agree.

THE COURT: Okay. What you're saying, with respect to that issue, there's no light between the two parties?

MR. CRABB: Correct.

THE COURT: All right.

MR. CRABB: With respect to character, there is some light. We're not familiar with the older case the defense cited, but we ask the court to consider the operative federal rules of evidence which we cited. And Rule 401 specifically says that generally character evidence is inadmissible but there's an exception for a defendant -- what's important,

it says a defendant may offer evidence of his character if it's a pertinent trait.  So the rules seem to be clear that just generally I'm a good person, that type of thing is not admissible.

And we're not aware of any trait, like for peacefulness, that might be brought up in a crime case, but any pertinent character trait that the defense could introduce character evidence on.  If such a trait is identified, we'd ask the opportunity to address with the court whether it's appropriate or not.

THE COURT:  All right.  Well, Mr. Kohlman seems to understand that to the extent he's going to proffer a witness on that, it's got to be in the pretrial statement, and we'll address it at the pretrial hearing and I'll have to get some basis for it.

MR. CRABB:  Thank you, Your Honor.  Ms. Ross will address entrapment.

THE COURT:  Okay.

All right.  Mr. Kohlman, let's hear from you about the defense motions.

(Defendant joins counsel.)

MR. KOHLMAN:  Let me tee up, because I think it's intellectually somewhat interesting, and that's our duplicity argument.  I remember way back early in the public defender days the government would put into -- conflate into one count

in the indictment voluntary and involuntary manslaughter.  And I raised an eyebrow about that.  Eventually it was litigated and it was determined that you cannot put into a single count basically two different offenses.  As the court knows, there are different elements that go into voluntary and involuntary manslaughter.

So you have in front of you clearly a count that arguably has four different bribes.  I think it's debatable whether the first bribe payment actually constitutes a violation of Section 201, but there's no question about the fact that there are four different counts.

So we say, and the court knows, that that's duplicitous. The government comes back, and I agree with them, that there's a strain of a -- *McDonnell* cases now that talk about a scheme and an opportunity.  I understand that doctrine.  So what does the court do, you, when you're confronted with on the one hand a *Blockburger*, straightforward, conflating four different counts, and a government that comes back and says well, look at these scheme cases.

Their own case -- and you've read this, but their own cases give you the answer, which is if you look at the indictment in its entirety and see whether in fact the government is in fact proceeding and has pled a scheme to commit bribery, or whether instead they've just simply lumped four different offenses into one count.

And you can take this indictment and squeeze it like a sponge and you can't see anything in there that talks about a scheme to commit bribery.

Now, I will tell you that it seems a strange place for the law to be that if the government ends up with an indictment with four offenses in one single count, that the only way to try to parse that is to take a look at the rest of the language. But that is the cases that the government cited, and of course now we've cited them and we're relying upon them.

And the cases from this circuit and another circuit that analyze this issue made specific reference to all the places in the indictment in which it made it clear in those instances there was a scheme to commit the underlying offense.

And it's just not in this particular indictment. As we pointed out, there's one reference, the word "scheme" is used once. That gets into the different positions the government has taken on the 2019 bribe, because there's a reference, I think it's at page 5, about the scheme continued, or some word like that.

But nowhere in the indictment is there an overarching -- and particularly on the four that are conflated and put into Count 1, nowhere is there any language that is found in those other cases. So we say to the court, perhaps this could have been cured and perhaps the indictment would have survived if

they had been express in terms of putting in language about that this was an ongoing scheme to commit bribery. But it's not in the indictment, for whatever reason, and therefore you're left with something that's pretty straightforward, and that is four different offenses put into a single indictment without any allegation that there was an ongoing scheme to commit bribery.

So as far as we're concerned, the cases cited by the government in their own brief support the proposition that there's no other alternative but to dismiss the indictment.

THE COURT: With respect to what little evidence has been put before me, doesn't that support the idea that it was a scheme, that the payments were based on a percentage of the contract rather than a specific payment for each particular ask?

MR. KOHLMAN: Well, I think -- let's put it this way. If the government had made this into four different counts, which is what we think that they should have done, I think it's debatable on the first count, again, whether it would have survived a motion for judgment of acquittal. But I think that the way I read the indictment, each and every one of them, there was a quid and a quo. There is money that is being given by the cooperator and there's a promise. And as you know, that's all it takes, and it could be for future remuneration, the 3 percent, whatever else. But each of them,

in the government's lights and the way they're drafted, are standalone and could easily be defended.  We have our defenses and we have our way of parsing the language.  But certainly they would pass a motion for judgment of acquittal, at least two or three of them.

So even though some of the commitments that were being made, arguably, according to the language, were for future increased payments, each and every one of them were standalone situations in which a payment was made, the quid, for a quo, and that is, according to the government, a promise to actually do something to influence a government official about contracts.

So I don't think -- in other words, I don't think that the government is home free by the fact that the language itself suggests future payments.

And again, this would have been such an easy matter to cure.  Just looking at the cases, whoever drafted it, they would have realized, and in fact, let's put in language that's been accepted in other instances about an ongoing scheme.  If the government had done that, I don't think I would have very much to say on this particular issue.  But I don't think that what the court is alluding to is enough to get the government out of the fact that they misdrafted the indictment.

THE COURT:  Do you want to make any points on any of the other parts of your motions?

MR. KOHLMAN:  Yes.  So let's go to -- it's a will-o'-the-wisp, but let's go to 2019.  We have a threshold argument, and I realize that the case law is not legion, but the case we are relying upon is very strong, and that is that you as the gatekeeper should not even allow a reference to the 2019.

And I'm not going to go through all the warts that are on the cooperator.  We put them in the brief and you've already read it so I don't have to go through a recitation of all the issues that go to his credibility.  So we'll put that aside and let you decide whether or not you want to allow this testimony in the first place.

So the government's papers go from 2019, there's references to it being a bribe, then there's a reference to -- which I suppose would arguably get into predisposition, although that's the one argument that the government's never made, to my knowledge, anyway -- and then it goes to a reference to it being a scheme in the sense that the next four payments are a continuation of the scheme.

Then it gets to when we argue that in fact it should be excluded, that well, actually, it's inextricably intertwined with what happened five years later.  And we point out that those cases are cases much closer temporally in time that they're relying upon.  And finally, they call it 404 evidence. I mean, there's shifting, in other words, in terms of the

2019.

But however you look at it, either whether you as a gatekeeper shouldn't let it in simply because -- not simply but basically because it's completely untrustworthy evidence, or you accept our argument that in fact whatever probative value there is in such flimsy evidence is far, far outweighed by the prejudicial impact of it.

Any way you look at it, we think that that 2019 reference -- you're talking, Your Honor, literally -- I did the math and I can't do it right this very second -- almost 600 days in which the witness will be on the witness stand over there and say I can't tell you which 600 days this bribe took place.  And in fact, I can't say for sure whether it was two bribes of 10 or one bribe of 20.  I can't tell you where in the four quadrants of the city the bribe payments were made.

That's what the government wants to have the jury hear about something that happened in 2019 or 2020, without any corroboration.

Whether you see it as your role as a gatekeeper to keep out evidence that is unreliable, or whether you say to yourself maybe it has some probative value but the prejudicial content would so far outweigh it, either way you look at it, it seems to me it should be excluded.

We've argued that the indictment does not make out a

*McDonnell* official act.  And I think -- I think our papers are pretty straightforward on it.  It seems like the government's refuge on that particular issue is that this may not be actually necessarily the first prong, and we concede and agree that there's three prongs to the bribery statute 201.  But we don't think that the facts as pled by the government make anything else out other than 201.

It's certainly not 202 that talks about fraud basically being done by the defendant in this case.  There's no allegation whatsoever that -- whatever else Mr. White is accused of doing, it certainly doesn't constitute fraud.  And while there's several different theories under the third prong, we don't think that any of those theories support the government's proposition that in fact they could proceed under the third prong.

So to us, this is a straightforward *McDonnell* case.  And as we put into our pleadings, I don't think that even under the government's best interpretation of what Mr. White was saying in these recorded conversations, they're making out that in fact he was committing himself to -- even committing himself, putting aside the fact, as you'll learn at trial, that there was no there there; nothing ever happened in terms of Mr. White with any government official.

But as we parse the language that's in the indictment, we don't think that even it makes out on its best facts for the

government a situation of official acts.

Court's indulgence again.  Let me just check my notes one more time to make sure.

(Pause.)

Just briefly on a couple other points, Your Honor.  One is the government's put us on notice that they intend to use some evidence of gambling on the part of Mr. White.  That might have a little bit more strength to it if they were able to come into the court and say that we've got the serial numbers that were given to Mr. White on these four occasions and we can track those serial numbers into his -- using those for legal gambling.

But they don't have that, to my knowledge.  And based on that, we've cited several cases that say that in and of itself gambling brought into a case, where there's no allegation that there was anything improper about the gambling, is prejudicial and should not occur.  And in this case, again --

THE COURT:  Let me ask you this question about that.

MR. KOHLMAN:  Yes, sir.

THE COURT:  You argue that it's cumulative to the video evidence, which arguably it could be.  But you don't come right out and concede that the video evidence is actually what happened.  So the government often in these situations are presenting this evidence in order to show why he needed the money.  They seem to be saying something different here.

They're saying we want this in to show that he kept the money. He was given the money and he kept it, which seems pretty clear in the video.  But you haven't conceded that point.  If you concede that point, then there may be no need for this evidence.

MR. KOHLMAN:  That is a very interesting observation on the court's part.  I'll tell you what.  We're going to be here for a little bit longer, let me kin of mull that over.  I understand exactly where the court is.  Let me mull that over.

And the other issue I wanted to put in front of the court -- and I understand the matters shift during the course of litigation.  But there has been some shifting on the government's part in terms of 404 evidence.  Initially we were told there wasn't any, but just take a look at the indictment, the 2019, and now 2019 is being recharacterized and recast as in fact 404 evidence.  And I understand that, and the issue is joined on that.

We mention in our papers a few other issues that we want -- I guess let me rephrase it.  I think today is the day that we ought to know for sure is there any other 404 evidence.  And we listed some things that we don't think constitute 404 evidence, and I'll give you one example.

The cooperator claims that he gave a campaign contribution to Mr. White some time ago.  I don't know whether the government intends to call that 404 evidence.  They haven't

yet.  But I think today would be a day that we'd be entitled to know is there any other 404 evidence out there that they intend to use.

This case could have gone to trial in January, it was set to go to trial in March, it seems like it would be fair for the defense to know finally is there anything else.  Because if there isn't, that's one thing.  If there is, then that just necessitates the defense doing more investigation into that particular allegation.

So that's where we are on the 404.  We think that I've made the point that the 2019 doesn't qualify and shouldn't qualify.  But we'd also like the court to be clear to the government that in fact they should put their last 404 card on the table if there are any more so we would know and we could respond appropriately.

I think that that touches the bases.  If there's any other questions on what we filed --

THE COURT:  There's not.  I will give them a date on that 404 issue.  Probably won't be today.

MR. KOHLMAN:  Okay.  Very good.  Thank you, Your Honor.

THE COURT:  Go ahead.

MR. CRABB:  Your Honor, Ms. Ross and I have divided these up.  Is there any particular order the court would like us to address these issues?

THE COURT:  No.

MR. CRABB:  Then I'll begin.

THE COURT:  All right.

Is the gambling one within your purview?

MR. CRABB:  No, it doesn't.  Would you like me to sit down?

THE COURT:  No.  We can go ahead and do the others.

MR. CRABB:  We seem to have bad syncing this morning. But the duplicity does, and I would like to briefly address that and make a couple points.

First, I believe one of the last things the defense was stating is that the four payments stand up as individual bribes.  That may or may not be true.  We do believe, as the court seemed to have alluded to, there was ongoing payments and it wasn't as clear each meeting which actions that Mr. White would be taking the payments were for.

But we believe that's beside the point, because the D.C. circuit held in *Bruce*, 89 F.3d 886, that it could be either one; they're not mutually exclusive.  Something could be four counts or it could be a scheme.  So we're not necessarily agreeing with the defense characterization but we believe it's irrelevant, because just because it could have been charged theoretically as four individual counts does not exclude it being charged as a scheme.

And with respect to the allegation that the indictment is duplicitous, if I could briefly make two points.  One about

what's actually alleged here, and two, the drafting issue the defense seems to be raising.

I'd like to raise a few points with respect to the allegation that the indictment is duplicitous. One is about what's actually charged here, and second, what I understand the defense to be arguing is a drafting error which is fatal.

First, clearly the conduct charged here is a scheme. It's several meetings over a period of time, and there are discussions about different grants. There are discussions, always raised by the defendant, about other schemes they could do, other things they could get into. So the facts here are clearly of a scheme and an ongoing situation.

With respect to the defense argument about drafting, which seems quite pedantic, first, we don't believe indictments are to be read in the way that defense suggests. Courts are clear that indictments are simply to set out what's been alleged. But addressing this issue about whether or not the -- sorry, excuse me one moment, Your Honor.

-- about whether or not it's clearly alleged that this is a scheme, we'd ask the court to consider a couple of things about the indictment itself.

First, we'd ask the court to consider -- on page 7 of the indictment in bold it says "2024, acts in furtherance of a bribery scheme." That seems pretty clearly to allege a scheme.

Then going to the end of the indictment, paragraph 69, which is the actual charging part of the indictment, again it's made quite clear there that this is alleged as a scheme. And we'd ask the court to consider specific language.

First, the charge account, Count 69, says, quote, "from August 26, 2024" -- excuse me -- "from June 26, 2024, to August 18, 2024," clearly indicating it is a scheme in a period of time.

Second, the indictment characterizes the incidents where Mr. White met with the cooperator and says, "in the form of four cash payments."  Doesn't describe them as individual bribes, describes them as cash payments.  Also, in paragraph 69, the charging paragraph, it clearly talks about the amount of money that was agreed upon and the amount of money that was received, and it's a conglomerate.

So we do believe that the defense is being hyper technical with respect to drafting, but even engaging in that discussion, this indictment is drafted correctly to allege a scheme.

I have nothing else on this issue unless the court has questions.

THE COURT:  I do not.

MR. CRABB:  The other issue I have, Your Honor, until the court gets to the good part with Ms. Ross, is the allegation that the indictment should be dismissed because it

fails to assert an official act.  As the court knows, we had three responses to that which I would like to address briefly.

First, there are three ways that 201 can be committed, and we believe the defendant's wrong when it argues that that's not alleged in the indictment.  And again, if the court will indulge me, I'd like to point out a couple things about the indictment.

Perhaps most importantly, again going to the charging paragraph, paragraph 69, it explicitly alleges each of the three means by which Section 201 bribery may be committed.

Furthermore, there are facts alleged in the indictment that fit each of those three.  First, I would ask the court to consider -- sorry, excuse me one moment, please.

With respect to the second method, which is a fraud on the United States, paragraph 80 of the indictment explicitly sets out that ONSE, one of the entities, a city government entity that some of these grants were awarded from to the cooperator with the help of Mr. White, it explicitly alleges that he got federal funding.  So clearly there is an allegation here that Mr. White perpetrated a fraud on the United States.  So that means of proving this charge is at play.

The other means, before we get to official act, is the third, which is that we'd have to prove that Mr. White used his position improperly.  It's, quote, a violation of official duty.  And we believe that official duty and official act are

two different things.  And the cases hold that official duty is broader than official act.  And we do believe that the evidence will show, and more importantly at this point the indictment alleges, that Mr. White did indeed violate his official duty.  And with respect to that, we'd ask the court to consider several parts of the indictment again.

First, in paragraph 2, it sets out obligations Mr. White had, ethical obligations to the city of Washington, and more specifically the council.  Similarly, paragraph 4 sets out obligations Mr. White had which he failed to do in relation to this scheme.

So just to recap on that issue, all three of the means by which Section 201 may be violated are alleged here, and there's information in the indictment to address each of those.  So it's certainly premature at this point.  The evidence will fall as they fall, but the indictment does allege all three means by which 201 may be violated.

And then if I could end with official acts.  First, there are a number of official acts alleged in this indictment which are consistent with the guidance of the Supreme Court in *McDonnell*.

If I may take a slight divergence.  As we tried to point out in our papers, before we even get to defining official acts, the defense is inviting the court to make factual determinations now about state of mind, intent, what Mr. White

meant, what Mr. White agreed to, what was in his head, what was in the cooperator's head. And those are quintessential factual issues for the jury to determine. So we'd ask the court not to get involved in resolving some of these factual issues.

But putting that aside for a moment, there are, as we set out in our brief, a number of official acts are alleged. We ask the court to consider what *McDonnell* said, that meetings can be an official act if at least one of two things happen: The defendant pressures someone else to do something or advises them to do something. So we don't believe *McDonnell* said a meeting cannot be an official act. It's just meeting with more could be an official act.

And it's certainly alleged here, Mr. White on a number of occasions talked about meeting with government officials. He talked about threatening a government official with not voting for a confirmation if she didn't do what he wanted with respect to one of the cooperator's contracts. He talked about trying to convince them to do it. So those are clearly official acts.

And closely tied to that, we'd ask the court to consider the fact that it doesn't matter whether the official act was actually performed. It could be an agreement and not actually done. And more so, as the *McDonnell* court pointed out, the defendant could have no intention of doing it. He could be

shamming or conning the briber.  Even if he has no intention to perform the official act, if there's an agreement to do it, that's sufficient.

I have nothing else unless the court has questions.

THE COURT:  No.

MR. CRABB:  Thank you, Your Honor.

MS. ROSS:  I believe Your Honor may have had some questions about the gambling issue, so I'll defer to the court with any questions on that.

THE COURT:  Yeah, just the same question I gave to Mr. Kohlman.  Am I understanding the purpose of this evidence correctly?

MS. ROSS:  That's absolutely right, Your Honor.  You nailed it.  The government is providing it to show that the defendant was given money, accepted the money, kept the money, and never gave it back.

THE COURT:  Okay.  So to the extent that the defendant were to concede that what -- the video is authentic and he was given that money that's reflected in the video, and he kept that money given in the video, would there be any necessity for the gambling information?

MS. ROSS:  We would argue that it would show that he kept it, Your Honor.  Even if he conceded that he was given money in the car and that he kept it, there would perhaps be a lingering question in some of the jurors' mind about whether

he gave it back at a later point.  So we would use the gambling evidence to show that he did keep it and he did not have an opportunity to give it back because he spent it at the casino.

And just sort of tied in to that is the defendant's argument in his papers that this requires some sort of sudden wealth, that the defendant was a D.C. council member at the time, he was paid a salary, that he could have been using legitimate funds at the time.  And the government has reviewed the defendant's bank accounts at the time, and I'm happy to go into the value in his bank account at each time, and sort of underscoring our point that he took the money from the CHS and spent it at the casino, and that these were not legitimate funds, is the fact that on June 26, the day of the first payment, the defendant only had $78.21 in his bank account. He then deposited slightly over $3,000 and then spent some of that money later on.

And, Your Honor, if I may, just one quick moment.

(Government conferring.)

And I'm sorry, Your Honor.  So just again to sort of continue on that point, the fact that this money that the defendant gambled shortly after receiving the bribe payments was not a source of legitimate funds, July 17 he had $269.51 in his bank account.  July 25 he had $157.82 in his bank account.  And August 9 he had $1,007.17.  So certainly the

strong inference, just bolstering the credibility that the defendant took this money and went to the casino, is referenced in the money in his bank account, sort of counteracting the defendant's point that this could have been legitimate funds.

And so related, Your Honor asked a question about whether if the defendant were to concede that this money -- that he did keep the money, that it was money in the envelope and that he kept it, certainly that's something that the government would be open to working out the details of what that agreement would look like, and certainly that is something that we would consider.

But the government just wants to make clear if that does not come to fruition -- defense counsel indicated he was still thinking about it -- that we believe that this evidence is relevant, it's not prejudicial, and that it should be admitted.

And then, Your Honor, going to the 2019 conduct, I don't know if Your Honor had any specific questions about that, but I'm happy to kind of launch right in.

THE COURT:  Go ahead and launch.

MS. ROSS:  First, Your Honor, the government wanted to make the point that this is a low standard for admissibility. The evidence is reliable for these purposes by a preponderance of the evidence standard.  And the evidence is not as

amorphous as defense counsel wants you to believe.  The CHS has been consistent that in 2019 he gave the defendant $20,000 to use his official position to help him resolve the 2019 contract dispute.  That has been consistent throughout.

And even bolstering that is the fact that on the recordings, they talk about it.  It wasn't the CHS who first brought it up.  It was actually the defendant himself who brought up this 2019 conduct.  And we quote to it in our brief, Your Honor.

And so it's clear that this is something that they talk about on the tapes, and so the jury's going to have questions about it.  So it's admissible for a number of reasons.  I think first and foremost to establish the fact of a prior corrupt relationship.  And the case law is very clear that that sort of evidence going to a prior corrupt relationship is intrinsic to charged offenses, and certainly it would be here even more so, because it completes the story.

It shows why, when the defendant and the CHS were in the car, when the CHS offered him money, the defendant did not question it.  It shows that the defendant trusted the CHS in that moment.  And certainly if the government is not allowed to present the intrinsic evidence of their corrupt background, the corrupt relationship, the jury's going to wonder why all of a sudden out of the blue was the defendant, without asking any questions, just being handed money and not asking any

questions about it.

And then, later on, when the defendant first brings up the 2019 conduct -- and he is the one who first brings it up -- if the government is not allowed to explain what that is a reference to, the jury may be left with lingering questions about that.

And so the government wants to make very clear that it is its position that it is first intrinsic, and even if Your Honor finds it's not intrinsic, for those reasons, that it is admissible as 404(b).

And, Your Honor, it's my understanding that you're going to set a 404(b) deadline down the road.  The government wants to make very clear we're not sitting on anything at the moment. We haven't noticed anything because we don't believe anything -- again, that the 2019 conduct is 404(b) and we don't have anything else that we intend to notice at this time.

And of course, if we do come into additional evidence as we continue to prepare for trial and investigate this matter, we would of course notice it as soon as possible, and that would be our intention, of course.

THE COURT:  All right.  So what is your response to Mr. Kohlman's argument that you address the 404(b) but not the predisposition evidence in opposing their motion?

MS. ROSS:  Again, Your Honor, at this point -- it's

sort of my understanding that predisposition evidence would be included in 404(b).  They're sort of interchangeable.  So at this point, I would say we don't have 404(b) evidence, predisposition evidence that we've noticed yet.  At this point we don't have any that we intend to.  And again, if we do uncover any evidence that we do wish to present at trial that goes to predisposition or 404(b), we would of course notice it.

THE COURT:  Okay.  So you're not saying that this evidence is -- you're not noticing this as predisposition evidence because we haven't decided the entrapment issue yet; you're saying, either way, you don't intend to introduce it as predisposition evidence.

MS. ROSS:  Sort of this theoretical evidence that we may or may not have?  No, Your Honor.  We --

THE COURT:  Well, he points to some specific types of evidence.

MS. ROSS:  That's right, Your Honor.  In terms of the specific categories, I will say that we do have evidence of those things, for example, the travel expenditures, the campaign contributions, the bribes.  I mean, we do have evidence of these things.  At this point we do not intend to offer any of that evidence.  In fact, we do intend to admonish the CHS that he should not go into details about the travel that he paid for Mr. White to go on, or the fact that he did

make campaign contributions.

I think on direct examination we'll tell him to not offer that evidence.  Of course, if it comes up in cross-examination, we can't control that.  But that is our intention, Your Honor.

THE COURT:  All right.

(Counsel conferred.)

MS. ROSS:  And, Your Honor, I may have slightly misunderstood your question or not answered it fully.  I think, if I'm now understanding correctly thanks to the real brains behind this operation, if your question is whether they do present some sort of entrapment defense, or allowed to do that, if we would anticipate introducing any of this evidence as a way to counter that.  And we would like to preserve that, Your Honor.  That could be an option for us if it does come to that.

THE COURT:  At what point would you make that decision, then?

MS. ROSS:  I think in terms of perhaps in a rebuttal case, Your Honor, we would inform Your Honor as soon as we would know if we believed that would be necessary.

THE COURT:  All right.

MS. ROSS:  And, Your Honor, I know this moment has passed slightly, but there was just one more point I wanted to make on entrapment, which was the main focus, I think, or what

seemed to take up a lot of the defendant's arguments was the background and the nature -- the background of his relationship with the CHS and how that may have entrapped him into the present offenses.

But entrapment really only focuses on the present charges. So in terms of the background of the relationship, I don't see how that could form an entrapment defense here. I just wanted to make that one point.

THE COURT:  All right.  Thank you.

All right.  Mr. Kohlman, you get the last word.

MS. ROSS:  Thank you, Your Honor.

MR. KOHLMAN:  Thank you, Your Honor.  I can go through these pretty quickly.

On the duplicity issue, let me make two points.  Number one, ironically the government again cited the *Bruce* case, which is the very case that we're relying upon.  And that's the case, *Bruce*, that relies upon *Hammond*, a Seventh Circuit case that talks specifically about parsing the indictment before you decide whether there's a scheme or not.  And that's the case that we're talking about.

In terms of whether or not the three prongs of 201 -- as the court knows, the second prong -- and I'll just read it -- is "being influenced to commit or aid in committing or to collude in or allow any fraud or making opportunity for the commission of any fraud on the United States."

That dog might hunt if we were talking about the 2019 alleged bribe, because the 2019 bribe is where the cooperator was accused of, apparently correctly, falsifying documents, in other words vouchers and things like that.  But there's nothing in this indictment -- this is the point I'm trying to make -- nothing in this indictment that says that when allegedly Mr. White said he was going to help the cooperator on his present extant contracts, that there was anything fraudulent about it.

There's nothing in the indictment that would fit with the second prong.  In other words, that Mr. White by accepting money was trying to help the cooperator into continuing a fraud that he was doing on the District of Columbia government.  So there's no way this fits the second prong.  I think we're right on the third prong, but I do want to emphasize that particular point.

On the gambling, I think that you were suggesting or my understanding of what you were suggesting is that if we concede that he received the money, not that he kept it but that he received the money, and I understand the court's point that your own eyes can perhaps determine that, that that might take the gambling out of play.  I think the government tried to push back a little bit and suggest that we not only have to concede that he received the money, but kept the money.  And I guess what I'd like to do is consult with my team and I'll

give you an answer back.  But if it's on whether he received it or not --

THE COURT:  Well, it's going to take a bit of time to write this opinion, so you can --

MR. KOHLMAN:  Fair enough.

THE COURT:  If you can moot the issue out, perhaps just alert the court.

MR. KOHLMAN:  Thank you.  I do want to make a comment on this, these are streamlining the trial.  Number one, I think you read already we don't have any objection to the case agent sitting here, so we can put that aside.  I don't have any problems with the self-authenticating issue that they brought up.  There's five or six different bank records and I think three different banks and the Naval Credit Union and OIG documents.  To streamline matters, I don't have any problems with that.

What I would like to know, and perhaps we can work this out informally, is that in the self-authenticating documents, one of them talks about 219 pages and another one talks about 2,000-whatever pages.  I would like to make sure that I understand exactly which pages I'm agreeing to from the documents.  And I also want the door to swing in the other direction: if I decide that I need Harbor Bank or Truist Bank or Bank of America records for my purposes in confronting the cooperator, I'd like to know that in fact I will have access

to the same self-authenticating --

THE COURT:  Okay.  Talk to the government about that stuff.

MR. KOHLMAN:  Yes.

THE COURT:  Where things stand now, the motion is unopposed by two sets of attorneys, so --

MR. KOHLMAN:  Yes.  And then the final point I would like -- or house cleaning I would like.  You gave us until I think March 13 if there were any new motions that came out of the belated production.  I've asked for a couple weeks more than that for personal reasons.  Members of my team might not be available during the next week or two.  And if we could do it by the end of March or the first part of April, that would be --

THE COURT:  Well, I'm going to keep the date where it is now, because depending on what happens with Ms. Ross's trial, I may move up the trial from May.  So I'll wait to hear on that.

MR. KOHLMAN:  Okay.  Very well.

All right.  And that's all I have, Your Honor.  Thank you.

THE COURT:  All right.  Thank you.

Anything else we need to resolve today?

MR. CRABB:  Not for the government, Your Honor.

THE COURT:  All right.  So there was the issue, I had originally tolled the time until today under the Speedy Trial

Act.  Since then we've obviously moved the trial.  Is my understanding correct, Mr. Kohlman, that your client is amenable to tolling of the time between now and whenever that trial takes place, in May or September?

MR. KOHLMAN:  That is correct, Your Honor, yes.

THE COURT:  And I assume the government, which filed something asking me to do that, is in agreement.

MS. ROSS:  We are, Your Honor.

THE COURT:  Okay.  So I will toll the time in the interest of justice so we can resolve all these issues.  The motions are still pending regardless, so it's currently tolled, but -- until the time of trial, which is now set for September, but to the extent we move it up to May, it'll be until May.

Anything else we need to resolve today?

MR. KOHLMAN:  On behalf of Mr. White, no, Your Honor.  Thank you.

MR. CRABB:  No, Your Honor.

THE COURT:  All right.  Thank you.  You're excused.

(Proceedings adjourned at 11:06 a.m.)

\* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne