**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TRAYON WHITE, SR.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No: 1:24-cr-00406-RC<br><br>JUDGE RUDOLPH CONTRERAS |

# TRAYON WHITE'S OMNIBUS POST-TRIAL MOTION FOR ACQUITTAL AND/OR DISMISSAL ON DOUBLE JEOPARDY GROUNDS

Defendant Trayon White, Sr., through undersigned counsel, respectfully files this Omnibus Post-Trial Motion for Acquittal and/or Dismissal (1) supplementing and amending counsel's oral and written motions for judgment of acquittal under Federal Rule of Criminal Procedure 29(a) ("Rule 29 Motion"), as invited to do by the Court on September 28, 2026, and in addition, (2) similarly memorializing his arguments for mistrial on September 28th, and moving the Court for dismissal of this case based on the constitutional prohibition against Double Jeopardy. In support of his Omnibus Post-Trial Motion, Mr. White submits the attached Declaration of Nicole Ledesma, incorporates defense counsel's prior oral arguments, asks this Court to consider all the files and records of this case, and argues as set forth below.

## INTRODUCTION

This Court can prevent a travesty of justice occurring to the four-times elected representative of the District of Columbia's great Ward 8, at the hands of a federal prosecutor's office that clumsily targeted him just as he stood for re-election. Mr. White's votes for acquittal at trial should have been from all 12 jurors -- not just the 9 for acquittal versus the 3 for conviction that occurred. Trial revealed the Government's undercover sting operation in this case

to be a failure on many levels, worthy of the textbooks. Despite setting up each and every recorded meeting between Allieu Kamara and Mr. White, and on-camera transfers of four envelopes of taxpayer dollars, the Government failed to gather evidence of a corrupt *quid pro quo* before finishing its operation after only seven weeks. Faced with the legal incoherence of what evidence it had collected, the Government mashed everything into Count One of the Indictment -- at least everything in 2024 related to Kamara's Violence Intervention contracts with the District of Columbia. This count packed into a single alleged bribery scheme: four payments of cash totaling $35,000; a distinct promise by Kamara to pay 3% of such contracts if they were renewed through Mr. White's actions with the city; and various alleged purposes (i.e., predicates) for the bribery on which jurors could convict.

However, evidence at trial fell short of proving any strain of bribery alleged in Count One beyond a reasonable doubt – and as to some, specified below, the failure of proof was absolute. Such a dizzying variety of legal theories, however, risked the deadlock that occurred – with 3 jurors encouraged to find some corrupt purpose of Mr. White's as to those D.C. contracts to justify *their own* vote to convict. Unanimity was only required as to which one of the payments he accepted somehow corruptly.

The 3 jurors holding out for conviction also had before them Kamara's completely uncorroborated allegations of a 2019 bribe, the strong whiff of wrongdoing emitted by Special Agent Gano's "overview" testimony about the FBI's opening of a 2023 investigation into Mr. White (which led nowhere), and the Government's emphasis in its examination of Kamara of nascent discussions of mental health and federal contracting possibilities. A jury instruction then characterized the latter as "testimony about bribery schemes" that jurors could "accept." The full

story of this late-breaking, inflammatory language for the jury will be told for the first time in this motion and the attached declaration.

The defense respectfully requests that the Court now grant a judgment of acquittal under Rule 29 because the testimony, audio and video evidence, and text communications admitted at trial did not adduce proof that a reasonable juror could find shows beyond a reasonable doubt that Mr. White acted "corruptly," intending to be influenced or induced to act in a *quid pro quo* for any prohibited purpose. This failure of proof extended to all four payments, and to all three different purposes – one of which was split further into three more sub-purposes of committing different ethical violations as a D.C. councilmember. There was also a failure to show proof that a reasonable juror could find beyond a reasonable doubt that there was an "agreement" as to these payments. Instead, no reasonable juror's eyes and ears could miss how Kamara thrust the unsolicited cash on Mr. White at their first meeting without any prior understanding of what acts it was for. At most, Kamara asked that Mr. White look into the status of Kamara's contracts after that cash transfer. Kamara explained a later payment as a "thank you" -- the language associated with a gratuity. No later request for payment involved a promise. This cash-payment thread of the FBI's vaguely-planned operation, allegedly to have Kamara "act natural" with Mr. White, can result in no conviction.

The failure of proof also occurred as to Mr. White's alleged agreement with Kamara to receive another $156,000 as part of a deal for 3% of all contracts Mr. White could get rolled over into the next fiscal year. The Government here most surely failed the test for corrupt intent that, in exchange for the thing of value, Mr. White intended to be influenced to act in the prohibited ways. In addition, there was a failure of proof beyond a reasonable doubt that there was an agreement as to a 3% kickback proposal that Kamara and the FBI concocted before the second

meeting. Finally, there was an abject failure of proof that Mr. White took **any** step in furtherance of this supposed agreement for 3%, including by accepting any promised 3% money.

Independently, to enforce Mr. White's constitutional right against double jeopardy, the defense also respectfully requests that the Court dismiss this case, rather than re-trying it. This would be an unusual step after a hung-jury mistrial, but the extraordinary facts of this case should permit this Court to distinguish, limit, and/or not extend existing precedent, or else recognize an extension or modification of existing law. Government over-reaching -- to some extent allowed by the Court, to some extent not -- set the stage for the jury here to deadlock. These circumstances take this case out of the rule ordinarily permitting retrial after a mistrial requested by the defense.

As argued below, the Government should not have been permitted to intermingle before the jury all these legal theories for conviction, including ones for which it offered absolutely no serious evidence. The Government should not have been permitted to introduce "overview" evidence that Mr. White was under FBI investigation as far as 2023. The Government should not have been permitted to encourage hold-outs for conviction with emphasis on discussions of mental health contracting and other unspecified U.S. Federal contracting possibilities it called "bribery." The Government gave no support to the proposition that these allegedly corrupt discussions were *necessary* to proving the bribery scheme for D.C. violence intervention contracting charged in Count One. The Government succeeded in instructing the jury about these allegations with inflammatory language. In the absence of a unanimity requirement, hold-outs were encouraged to pin the label of corruption on Mr. White without even one single charged theory lining up properly and gaining unanimity.

The law does permit the Government to charge a crime where its agent proposed the illegal scenario to the defendant in an undercover sting operation. But the ends of public justice do **not** require that an alleged offense which the government itself manufactured in the first place be the subject of multiple trials until the Government finds a jury willing to convict the target of its operation.

Therefore, for the reasons set forth further below, even with the high standards that apply, this Court should grant the motion for judgment of acquittal and the motion to dismiss on double jeopardy grounds.

## PROCEDURAL BACKGROUND

### I. THE INDICTMENT

On September 5, 2024, Councilmember White was indicted for Bribery under 18 U.S.C. § 201(b)(2)(A), (B), and (C) (Count One). *See* Indictment, ECF 12. The Government alleges that Councilmember White "corruptly demanded, sought, received, accepted, and agreed to receive and accept approximately $156,000, and received and accepted $35,000 in the form of four cash payments in exchange for using his position as a D.C. Councilmember to assist Company 1 and Company 2 extend their contracts at the ONSE and DYRS for VI Services." Indictment at 29–30, ECF 12.

The alleged purposes of these payments were various. They were allegedly in return for: (1) "being influenced in the performance of an official act," under § 201(b)(2)(A); (2) "being influenced to commit and to aid in committing," etc., "any fraud," etc., on the United States, under § 201(b)(2)(B); and (3) for being induced to do and omit to do any act in violation of official duty, of which the Government identified six, under § 201(b)(2)(C). These would later be reduced to three by the grant of a defense motion in limine.

In support of Count One, the Government alleged that there were four payments as part of the "Bribery Scheme": "Bribe Payment 1 – June 26, 2024"; "Bribe Payment 2 – July 17, 2024"; "Bribe Payment 3 – July 25, 2024"; and "Bribe Payment 4 – August 9, 2024." *Id.*

The Government alleged starting at Paragraphs 37 and 38 of the Indictment that, on the same day as Bribe Payment 2, Kamara and Mr. White agreed to an additional 3% if Mr. White "sealed up" extensions of the two D.C. contracts for violence intervention. No other contracts appear in the 30-page Indictment.

## II. <u>CERTAIN PRETRIAL MOTIONS</u>

From the early days of undersigned counsel W. Gary Kohlman's appearance, the defense in this case pressed the Government for notice of both Rule 404(b) evidence and predisposition evidence, the latter in the event that Mr. White brought an entrapment defense. The Court ultimately provided some relief on both counts, setting a deadline in May 2026 for Rule 404(b) notice and, to make a long story short, requiring the Government to give notice of predisposition evidence in a form consistent with the Pretrial Statement requirements for its case in chief, by no later than Friday, September 11, 2026.

No mental health or federal government contracts referenced in some of the videorecorded meetings between Mr. White and Kamara appeared in the Rule 404(b) disclosure that the Government subsequently filed (ECF 67), but the Government did include federal contracting as a potential topic in a disclosure letter to the defense about its predisposition evidence for a case rebutting the defense of entrapment on September 11th. (Exhibit A to Defense's Evidentiary Objections to Government's Notice of Predisposition Evidence to Rebut Mr. White's Entrapment Defense, filed under seal on 9/21/26, at 4) In its response to the government's objections to its proposed jury instructions, the defense objected to the lack of a

special instruction on unanimity. (ECF 82 at 15-17.) The defense further briefed its position on the lack of a special unanimity instruction on August 21st, 2026. (ECF 88.) The court ruled on the issue under seal on September 4th, 2026. (ECF 106 at 14-21.)

Granting a pretrial motion in limine, this Court trimmed down the third layer of the Government's single Count One from six to three theories of a "violation of official duty" predicate under Section 201(b)(2)(C) identified in Paragraph 2 of the Indictment, namely that Mr. White:

- used his position to influence the outcome of a matter that he knows is likely to have a direct effect on his financial interests — GEX 1 (redacted version), D.C. Council Code of Conduct, Period 25, p. 2, I(a)
- received anything of value in return for being influenced in the performance of official acts — Id. *at p.10, III(e)(2)*
- disclosed or used confidential or privileged information acquired by their position without authorization — *Id. at* p.19, VII(1)

On July 27th, 2026, the Government filed a motion to admit overview evidence. (ECF 71.) The defense filed a motion opposing the admission of overview evidence on August 14th, 2026. (ECF 78). The government responded later that day. (ECF 79). The court then issued a ruling on September 4th, 2026 permitting the use of overview evidence. (ECF 106 at 7-11.)

## III. SUMMARY OF THE EVIDENCE AT TRIAL

Arriving at the evidence introduced at trial, the Government could prove the vast majority of the contents of Mr. White's and Kamara's communications during the undercover operation initiated on June 21, 2024 with Kamara's approval by the FBI to conduct otherwise illegal activity on behalf of the Government. With the exception of unrecorded phone calls, the specific contents of which Kamara claimed at trial not to remember, audio/video recordings from inside Kamara's car, some audio recordings of phone calls, and some text messages set forth the chronology of the communications between Mr. White and Kamara during the undercover

operation. The Government admitted these materials in evidence, with transcriptions appearing at the bottom of the video recordings. Thus, while Government counsel asked scores if not possibly hundreds of times for Kamara to describe, interpret, and give his "understanding" of his and Mr. White's recorded words, they were already placed before the jury.

Further, more detailed discussion of the facts shown at trial appears below in the Argument sections.

## IV. TRIAL PROCEEDINGS AFTER THE PARTIES RESTED THEIR CASES

On Friday, September 18, 2026, after the Government rested its case, Mr. White moved orally for judgment of acquittal under Rule 29. The Court heard argument, and after the defense indicated the desire to put a brief in support of its Rule 29 motion on file in hopes of a decision before the case went to the jury, the Court took the motion under advisement. The defense filed an initial Rule 29 motion on the evening of September 20, 2026 (ECF No. 120), on the due date ordered by the Court.

On the afternoon of September 21, 2026, the Court held a charging conference. An issue raised orally by defense counsel at this conference was a proposed additional instruction for the jury to disregard testimony about matters in the undercover recordings between Kamara and Mr. White that involved the possibilities of contracts for Medicaid services, mental health services, and federal contracting opportunities. The Court heard argument on this issue.

The Government claimed that the evidence was intrinsic, so no instruction was appropriate. The Court reminded the Government that the Government had conceded that it was not basing any theory of the violation of the bribery statute on the federal contracts. The Government then stated that it would propose a jury instruction.

This Court made a suggestion that the parties talk to each other and come to an agreed-upon instruction. To which the Government replied, that it didn't hear the Court and then said: "Yes, Your Honor." The defense team understood from this exchange that it would receive a draft of the Government's proposed jury instruction for purposes of meeting and conferring as suggested by the Court and apparently agreed to by the Government, but nothing ever arrived for the defense's review prior to a Government ECF filing of several proposed jury instructions shortly before court the next morning. (Declaration of Nicole Ledesma ("Ledesma Decl."), filed contemporaneously, at ¶¶ 9-10; ECF 122.). The parties did not meet and confer and neither party communicated to the other party to do so. *Id*.

Defense counsel spotted problems with the Government's proposed jury instructions at ECF 122, and when court began at 9:30 am, the defense made objections to, *inter alia*, the one about the alleged intrinsic evidence. The defense argued that intrinsic evidence has to be "necessary" and that there was no argument by the Government as to why it was necessary to get into those items. This argument about necessity went unrebutted.

However, undersigned counsel did not call the Court's attention to the language in the Government's proposed instruction referring to "testimony about bribery schemes," which the jury would be instructed it could "accept." (Ledesma Decl., at ¶ 14.) Undersigned counsel had not spotted this language as problematic in a brief review of the proposed jury instruction, in what the defense described as a scramble to digest voluminous material. (*Id.* at ¶¶ 14-15.)

The Court finalized the jury instructions and emailed them to counsel before closing arguments that afternoon.

After closing arguments, the defense team met and decided to propose another jury instruction and, in the alternative, withdraw its original request to have a limiting jury instruction

on the subject addressed by the Court's "Limiting Instruction Regarding Certain Evidence." This was filed as ECF 127 at around 7:42 PM on September 22, 2026.

However, on the next morning of September 23, 2026, this Court denied the defense's requested instruction, the request in the alternative for the withdrawal of the limiting instruction altogether, and a hearing on the matter, as "too little, too late." The Court brought in the jury and gave the "Limiting Instruction Regarding Certain Evidence." Defense counsel then moved for a mistrial, based on the inflammatory nature of the phrase "bribery schemes." The Court stated that the defense had missed its opportunity to raise this issue and denied the mistrial motion.

The jury began deliberations mid-morning on Wednesday, September 23rd, 2026. Just before 2:00 PM, they returned with their first question. The jury wanted to know whether they needed to see a "contractual benefit to Kamara's businesses… in order for it to be bribery." (Jury Note 1, 9/23/26 at 1:56 PM.) The Court responded that jurors did not need to see any such contractual benefit and referred the jury back to his instructions on the elements of bribery. The jury did not return with another note until just before the end of the day, when they brought the Court two questions. First, they asked whether receiving money in exchange for an official act regardless of intent to follow through constitutes a violation of official duty. Second, they asked whether receiving money to perform an official act with no intention of fulfilling the agreement constituted bribery. (Jury Note 2, 9/23/26 at 4:50 PM.)

The Court responded to these two questions simply: "if the defendant received money to perform an official act but had no intention of performing the official act," the Court explained, "the answer to both questions is no." (Trial Tr. 9/24/26 at 10:15-18.) The Court then directed the jury back to the instruction on the elements of the charge (Jury Instructions at 34) and the definition of corruptly (Jury Instructions at 37).

The three subsequent jury notes all covered roughly the same ground -- that is, that the jury was deadlocked and could not reach a verdict. The first such note arrived just after 10:00 AM on Friday, September 25th, 2026. (Jury Note 3, 9/25/26 at 10:15 AM.)

The defense responded by moving for a mistrial, which the government opposed and the Court denied. (Trial Tr. 9/25/26 at 2:25-3:3.) This was the second mistrial motion, the first having come after the Court denied the defense's request to withdraw or modify the instruction on certain evidence regarding bribery schemes not charged in the Indictment.

The Court instructed the jury that it should keep trying:

> So within the grand scheme of things and my experience with juries that start having trouble reaching a unanimous decision, you have not been deliberating for that long. So I would like you to keep trying, you know?
>
> * * *
>
> I know it's a difficult statute and, obviously, from your very thoughtful questions, **you're thinking about a lot of different scenarios.** So it takes some time to go through this process. So thank you so much for your efforts.

Trial Tr. 9/25/26 at 3:10-4:2 (emphasis added).

Another note came a few hours later and stated that although the jury had constructive discussions, there had been no movement in individual jurors' positions, and the jurors had resolved to resume deliberations after the weekend.

The final jury note came on Monday, September 28th. The jury remained deadlocked, the foreman wrote, and further deliberations had only "cemented" jurors in their positions. (Jury Note 5, 9/28/26 at 10:30 AM.) In response, the defense again moved for a mistrial. Yet the basis of the defense's mistrial motion was not merely the fact that the jury was deadlocked, as Mr. Kohlman explained:

> Your Honor, we do make a motion for a mistrial. At this stage, the jury is starting to deliberate just as long as the trial itself. We've obviously got an intelligent jury. They know what the issues are. But I would say to the Court I want to incorporate in our motion for mistrial if there's anything that is standing in the way of an acquittal for Mr. White is the fact of the Government putting into one count in the indictment three different theories which can't have helped in terms of the jury trying to unravel this. I want to incorporate the earlier motions that we've made in terms of the -- for mistrial at the conclusion of the case and the other motions we've made into this motion, but when you put all those things together we do make a motion for mistrial.

Trial Tr. 9/28/26 at 2:17-3:5

The Court responded that it would allow the defense to "supplement that motion with citations to the transcripts and the like." (Trial Tr. 9/28/26 at 3:7-9.) After hearing from the government, the Court declared a mistrial and dismissed the jury. (Trial Tr. 9/28/26 at 3:21, 4:23-24).

**LEGAL STANDARD FOR JUDGMENT OF ACQUITTAL UNDER RULE 29(a)**

Rule 29(a) of the Federal Rules of Criminal Procedure provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." *United States v. Sutton,* 706 F.Supp. 3d 1, 12 (D.D.C. 2023) (citing Rule 29(a)); *United States v. Kayode*, 254 F.3d 204, 212-13 (D.C. Cir. 2001); *United States v. Harrington*, 108 F.3d 1460, 1464 (D.C. Cir. 1997). To succeed on a Rule 29 motion, a defendant must clear a 'very high' hurdle." *United States v. Hale-Cusanelli*, 628 F. Supp. 3d 320, 324 (D.D.C. 2022) (*quoting United States v. Pasha,* 797 F.3d 1122, 1135 n.9 (D.C. Cir. 2015)). Granting a defendant's motion for judgment of acquittal "is appropriate only when there is no evidence upon which a reasonable juror might fairly conclude guilt beyond a reasonable

doubt." *United States v. Weisz*, 718 F.2d 413, 438 (D.C. Cir. 1983); *United States v. Campbell*, 702 F.2d 262, 264-65 (D.C. Cir. 1983). Judgment of acquittal is inappropriate where "any reasonable factfinder could conclude that the evidence, viewed most favorably to the government, satisfied each element [of the offense] beyond a reasonable doubt." *Id*. at 12-13. In other words, a motion for judgment of acquittal should be granted only when "viewing the evidence most favorably to the government and according to the government the benefit of all legitimate inferences therefrom, a reasonable juror *must necessarily* have had a reasonable doubt as to the defendants' guilt." *Weisz*, 718 F.2d at 437.

This Court, in setting the briefing schedule for this Rule 29 Motion, included in its minute order a request that the parties address the following question: "[W]hether Rule 29 is the appropriate vehicle to determine the sufficiency of the evidence for a particular means or whether it focuses only on the sufficiency of the evidence for the entire element." (Minute Order 9/30/2026.)

The defense has searched for cases addressing this issue, and has two responses for the Court at the time of this filing, one week after the above minute order, while reserving the right to conduct and present additional research.

First, it remains Mr. White's position that jury unanimity was required on whether an alleged bribe payment satisfied the element of "corruptly" particularly through one or more of the "predicates" to *quid pro quo* bribery under Section 201(b)(2). These **are** effectively, alternative elements. The Court's question uses the different term "means" for them, and seems to refer to the collection of such means as "the entire element." Minute Order 9/30/2026.) The defense respectfully refers the Court back to the cases the defense has briefed recognizing the constitutional limits upon the extent to which jurors can combine their different findings of facts

to establish guilt of a single offense. *See, e.g., United States v. Hurt,* 527 F.3d 1347, 1355 (D.C. Cir. 2008 (analyzing under "plain error" standard whether "stealing" and "knowingly converting" government property were sufficiently separate conduct under 18 U.S.C. § 641 so as to require a special unanimity instruction). As the D.C. Circuit in *Hurt* stated: "The five Justices who agreed means-unanimity is not required also acknowledged a limit to what jury findings can be combined to support a verdict." *Hurt*, 527 F.3d at 1353 (*citing Schad v. Arizona*, 501 U.S. 624, 632-33 (1991) (plurality opinion) ("That is not to say, however, that the Due Process Clause places no limits on a State's capacity to define different courses of conduct, or states of mind, as merely alternative means of committing a single offense, thereby permitting a defendant's conviction without jury agreement as to which course or state actually occurred.").). Under a plain error standard where counsel had failed to object at trial in *Hurt*, the D.C. Circuit did not reach the question of whether a single count charged under 18 U.S.C. § 641 risked "creating a mishmash of stealing and knowing conversion" without a special unanimity instruction.

Here, however, Count One creates a "mishmash" of four separate incidents and three separate prohibited purposes under § 201(b)(1), and unanimity is required.

Similarly, in *Richardson v. United States*, 526 U.S. 813 (1999), the Supreme Court held that the continuing criminal enterprise statute requires jury unanimity in respect to individual "violations" constituting the charged predicate criminal offenses. 526 U.S. at 824. In so holding, the majority found the limits of Due Process breached because of:

> . . . the likelihood that treating violations simply as alternative means, by permitting a jury to avoid discussion of the specific factual details of each violation, will cover up wide disagreement among the jurors about just what the defendant did, or did not, do.

*Id.* at 819.

Where predicate violations of law are at issue in determining guilt for the offense, the majority in *Richardson* found excessive the --

> risk (present at least to a small degree whenever multiple means are at issue) that jurors, unless required to focus upon specific factual detail, will fail to do so, simply concluding from testimony, say, of bad reputation, that where there is smoke there must be fire.

*Id.* This result "in effect, imposes punishment on a defendant for the underlying crimes without any factfinder having found that the defendant committed those crimes." *Id.* at 822.

Rather than imposing these risks, the Supreme Court reasoned: "Congress might well have intended a jury to focus upon individual violations in order to assure guilt of the serious crime the statute creates." *Id.* at 820-21.

In construing the statute to require such handling, the Supreme Court broadly reasoned: "Nor can the Government successfully appeal to a history or tradition of treating individual criminal 'violations' as simply means toward the commission of a greater crime." *Id.* at 821. The analogy of the continuing criminal enterprise statute to a bribe charge alleging all of the predicate provisions under § 201(b)(1) is a fair one. Subsection (B) describes participation in a fraud offense against the United States, and subsection (C) describes violations of official duty, of which in this case the Government has identified several options. All of these alleged violations add options to the jury finding a corrupt *quid pro quo* for an official act under subsection (A). Present here in spades are all the dangers of fundamental jury disagreement about what wrongful conduct underlies the charged offense which the Supreme Court wrote in *Richardson*.

While the defense does not here seek to belabor the argument, rejected by the Court, that Section 201(b)(2) contains distinct *offenses* for each of the predicates (A), (B), and (C), the defense also notes that this Court in its ruling on unanimity did not analyze the applicability of

the principles the defense has drawn from *Hurt* or *Richardson* to argue that predicates (A), (B), and (C) are, in effect, *alternative elements* requiring unanimity as to each.

Adding weight to this conclusion, the law of conspiracy provides that if there are different acts or objects charged in the indictment, sufficiency of the evidence requires sufficiency as to each act or object. *See Griffin v. United States*, 502 U.S. 46, 56–57 (1991) ("[W]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, as Turner's indictment did, the verdict stands if the evidence is sufficient with respect to any one of the acts charged."); ("We agree with the vast majority of the Federal Courts of Appeals, which have made no exception to the Turner rule for multiple-object and multiple-overt-act conspiracies."). Analogously, if there are multiple purposes to the bribery scheme alleged against Mr. White, then sufficiency of evidence, i.e., a reasonable juror may find proof beyond reasonable doubt, should exist at the level of the purposes, the predicates at Section 201(b)(2)(A), (B), and (C).

The unanimity and/or sufficiency of evidence required on the level of bribery predicates answers the Court's question, and it should weigh for Rule 29 purposes the evidence on a predicate-by-predicate, as well as payment-by-payment, basis.

**ARGUMENT ON RULE 29(a) MOTION**

As the evidence came in at trial, a reasonable juror must have reasonable doubt as to Mr. White's guilt of bribery. The following discussion disentangles, spreads out, and addresses the Government's crowded bucket of legal theories, noting that trial made clear for the first time the distinct courses of the cash payments and the alleged 3% deal.

## I. AS TO KAMARA'S CASH PAYMENTS TO MR. WHITE, THE GOVERNMENT CANNOT PROVE BEYOND A REASONABLE DOUBT THAT ANY PAYMENT VIOLATED ANY OF THE BRIBERY PREDICATES AND SUB-PREDICATES

First, the Government has only shown that Kamara, their informant and cooperator, offered and gave cash money to Councilmember White several times, and that Mr. White kept it. Beyond that, there are multiple failures of showing, especially with proof beyond a reasonable doubt, that Mr. White satisfied the elements of bribery as to any of the charged cash payments.

### A. There Was No Quid Pro Quo To Be Influenced At All

Kamara gave Mr. White cash, but with no sufficiently clear *quid pro quo.* Viewed in the light most favorable to the prosecution, Councilmember White took payments *without* corruptly intending to be influenced to act.

Last month, in *United States v. Burke*, No. 25-3104, -- F. 4th --, 2026 WL 2794723 (D.C. Cir. Sept. 18, 2026), the D.C. Circuit held that the defendant had to have had the specific intent that, in exchange for the thing of value, he intended to be influenced to act in the prohibited ways. *See id.* at *10 (holding the jury was correctly instructed as to corrupt intent that the "Government must prove beyond a reasonable doubt that the Defendant intended to be influenced in the performance of a specific official act or acts). Meanwhile, it was incorrect to instruct the jury that: "A public official acts corruptly if the public official ... agrees to accept something of value with the understanding, at least in part, that, in exchange, the public official *is expected* to be influenced . . . ." *Id.* (emphasis in original) (discussing corrupt intent to commit an official act). A public official's mere knowledge that another person expects him to be influenced is insufficient; the public official himself must intend to be influenced. *Id.*

In other words, Mr. White's intent matters; Kamara's does not. In the first alleged payment video, there is a clear lack of any kind of *quid pro quo*: Kamara simply shoved the

envelope towards Councilmember White with no specific action requested or solicited. (GEX 14, at 2:13-2:24.) Councilmember White did not accept the bribery: in his own words, Councilmember White says, “I don't want to feel like you got to give me something to get something done. We better than that.” (GEX 14 at 2:23-2:27.) Kamara responds in acknowledgement that this is not a bribery: “I'm not saying use this to go do that.” (GEX 14, at 2:32-2:34.)

In the first meeting, Kamara had announced his plan to make a series of next payments to Mr. White, “hitting you off,” without there being a clear bargain in exchange for anything. (GEX 14, at 3:32-3:35.)

In fact, Mr. White made clear before the first recorded meeting was over, in direct reference to the cash, that “I got some campaign debt I need to take care of.” (*Id.* at 5:19-5:22.) This accords with Kamara’s statement to the FBI just days earlier that Mr. White had a need for campaign money, and Kamara had intended to provide him with cash. (Def. Ex. 103.)

The second cash payment had no specific nexus to requested action, and followed Kamara’s un-moored offer of “if you need anything”:

> MR. KAMARA: But if you need anything, I can meet
> you back in an hour, though.
> MR. WHITE: Yeah, yeah. I’m -- yeah, I'm
> hurting. I've been hurting for a minute.
> MR. KAMARA: Okay, so just --
> MR. WHITE: Yeah.
> MR. KAMARA: So just give me like an hour after
> this. But I wanted to ask you, though, you said
> something about that mental health stuff.

Govt. Ex. 15A at 19:20-20:3

Departing further from the Government’s narrative that the cash he handed Mr. White was a “bribe,” Kamara described on the video his later cash payment as follows: "That's

definitely for your hard work and knocking things out with Kwelli." (Trial Tr. 9/16/2026 AM at 38:17-38:20.) Asked the following questions about this statement by the prosecutor at trial, Kamara gave the following answer:

> Q. When you said "that's definitely for," what did you mean by "that"?
> A. Just pretty much I told him -- really telling him thank you for getting to this point where -- reaching out to Kwelli Sneed, making arrangements to meet with the deputy mayor and trying to make contact with the mayor as well, and the grant manager as well.
> Q. And when you said "that's definitely for that, " that -- what was that for?
> A. Meaning that the 5K that I gave him was telling him thank You.

(*Id.* at 79-80.)

What is being described here is not a federal felony of bribery, and the Government did not charge Mr. White under a gratuity theory. (None would work, either, given the lack of a proven predicate.)

No other discussion of cash money on the third and fourth undercover meetings involved promises of any action by Mr. White, either. The text before the third meeting where Mr. White asked for “10” reads as follows:

> KAMARA: We meet first right?
> WHITE: Can you bring 10
> WHITE: Yes
> WHITE: I need to ask Roger Bell something as well that I need clarity on as well. Nothing deep

GEX 44, at p. 48.

Before the fourth meeting, the following text discussion took place, where Kamara again offered cash with no understanding of what it was for, in response to which Mr. White spoke ambivalently about even taking it at all:

KAMARA: Ok. Cool. Do you need me to bring anything
TRAYON: let me check on that in an hour when I wrap up this meeting.
KAMARA: Ok. Let me know
TRAYON: Nothing is needed unless you're feeling generous lol
KAMARA: I'm definitely generous if we got project 1 and 2 on lock tomorrow
TRAYON: I haven't seen anything in writing, but from what I'm being told you should be good on both…
KAMARA: If you knocked it out the park I got you. What sounds to you
TRAYON: Can you do half ?
KAMARA: Yes

Govt. Ex. 44 at 60-61.

As to Kamara's follow-up as to Mr. White knocking it out of the park, Mr. White does not indicate one way or another and asks for **half** the usual amount that Kamara had been offering to give him. This is not proof -- far from it -- that Mr. White was accepting the money intending to be influenced to **take action** on behalf of Kamara's company.

The FBI and Kamara contrived all five meetings but cannot now spin through argument or interpreting testimony Mr. White's conversations and claim that the cash payments were exchanged for anything, beyond a reasonable doubt, in accordance with *Burke*,

B. <u>Mr. White Neither Agreed To, Nor Caused, "Official Acts" For the Cash</u>

To the extent that a reasonable juror could conclude from some circumstantial evidence that Mr. White did intend to be influenced **somehow** by the cash payments, then one question is whether his intention was to perform an "official act" as prohibited by § 201(b)(2)(A) or to pressure or advise someone else to commit an official act. No -- a reasonable juror could not conclude this beyond reasonable doubt.

The Supreme Court has specifically held that the acts of information-seeking and arranging meetings are not "official acts" for purposes of the federal bribery statute. *See McDonnell v. United States*, 579 U.S. 550, 569, 573 (2016) ("[b]ecause a typical meeting, call,

or event arranged by a public official is not of the same stripe as a lawsuit before a court, a determination before an agency, or a hearing before a committee, it does not qualify as a 'question' or 'matter' under § 201(a)(3)," further stating that meetings merely to "talk about a [project] or to gather additional information" or "simply express support" does not qualify either).

While applying "pressure" to other public officials, even giving them advice, under certain circumstances can satisfy this "official act" requirement, *see id,* at *572-73*, there is no evidence in this case that the **cash payments** to Mr. White were in exchange for that. Kamara's opinion, or counsel for the Government's argument, does not suffice.

The evidence at trial came in crystal clear that Mr. White performed no "official acts" himself, did not pressure anyone in city government to do so, and did not agree to do so for the cash Kamara was handing him. The city officials' testimony established that Mr. White only approached D.C. officials in ways that did not meet the bribery law's definition of "official acts" under *McDonnell*. At most, Mr. White only engaged in information-gathering conduct.

Former DYRS Grants Management Specialist Anwar Walker testified on cross-examination as follows:

> Q. Did Trayon White ever try to convince you to do anything
> about a grant contract?
> A. That's it?
> Q. Yeah.
> A. No.

Trial Tr. 9/16/26 AM at 139:11-15

Similarly, ONSE Director Kwelli Sneed testified on cross-examination that:

> Q. Mr. White did not ask you at that meeting to steer
> contracts or grants to anyone; right?
> A. No.
> Q. Mr. White did not ask you to let anyone keep their

> contracts or grants, did he?
> A. No.
> Q. Mr. White did not try to give you anything?
> A. No.
> Q. Mr. White never brought up your future position; right?
> A. No.
> Q. Mr. White never said that he would support you only if you would support particular companies; right?
> A. No.

Trial Tr. 9/18/26 AM at 118:5-17.

Lastly, Deputy Mayor Lindsey Appiah testified on direct examination that:

> Q. So just to be very clear about that, did the defendant ever contact you about the VI program?
> A. I don't recall having any conversations with the council member about the VI program.
> Q. And did the defendant ever contact you about specific violence interruption, or VI, companies?
> A. No.
> Q. Did he ever contact you directly about individuals supporting the violence interruption program?
> A. No.
> Q. Did the defendant ever reach out to discuss Life Deeds?
> A. No.
> Q. Did the defendant ever reach out to talk about Allieu Kamara?
> A. No.

Trial Tr. 9/16/26 AM at 104:8-22.

Kamara and his FBI handlers may have intended for Mr. White to be influenced by the cash to create pressure on other city officials, but that is not the legal test. It is Mr. White's intent to be influenced by the cash payments to commit an official act that matters, and there was none. Councilmember White never promised to take an "official act" in his meetings with Kamara, and his receipt of cash was at best contemporaneous with discussion of checking the status of Kamara's D.C. violence intervention contracts, according to Kamara's own testimony:

> Q. And what you asked him to do in that first meeting is look into the status of the contracts that you had right then; correct?

A. Yes.

Trial Tr. 9/17/2026 PM at 46:9–12,

* * *

Q. Okay. Thank you. And, in fact, in that first video, whatever date it was, there's not one single time, not one single sentence in which Trayon White says, "I'm going to put pressure on any government official." That's not in there, is it?
A. No.
Q. At the end of that meeting, he accepted the money in the envelope; correct?
A. Yes.
Q. Just like in the past, he had accepted campaign contributions from you and put them in his pocket; correct?
A. Yes.
**Q. You had asked him to look into the status of your contracts; correct?**
**A. Yes.**

Trial Tr. 9/17/2026 PM at 48:8–22 (emphasis added).

Therefore, the "official acts" prong of the federal bribery statute fails as to the cash payments.

C. No Reasonable Juror Could Find Mr. White Helped Commit Fraud For Cash

When Mr. White made his oral motion under Rule 29 after the Government rested its case, the defense contended there was a complete absence of proof that Mr. White violated § 201(b)(2)(B) by assisting a fraud against the D.C. government, and then the Government ventured to the Court its first disclosed theory of how its fraud theory worked:

MS. ROSS: . . .The defendant had to have accepted the money in exchange for being influenced to commit fraud against the United States. For all intents and purposes, the D.C. government is the United States in this case. Clearly, Mr. Kamara's contracts were with the Department of Youth and Rehabilitation Services, as well as with the Office of Neighborhood Safety and Engagement, the D.C. government. **And those were tax dollars that were being spent on those lucrative government contracts, and the defendant agreed that he would take those contracts out of this -- out of the normal contracting process to try to get them extended.**

> Mr. Walker certainly said that there is a standard extension process to make sure that contracts are qualified to be extended, and the defendant, who's going to disregard that, go straight to the people in charge, not necessarily because Mr. Kamara's contracts qualified for those extensions, not necessarily because they were the best value for the residents' tax dollars or because they were providing the best services, but because he was getting paid.
> So that -- what committing fraud against the United States really boils down to is whether the defendant attempted to or did cheat the United States; in this case, the D.C. government, out of money and property. By taking the contract out of that normal standard contracting process, that's what he was doing, attempting to cheat the D.C. government.

Trial Tr. 9/18/2026 PM at 24:23-25:22 (emphasis added).

The Government's skeletal theory lacked any evidence at trial that Mr. White understood that he would be "circumventing" a specific required procurement processes by going and talking to program managers to find out what was going on, which is all he actually did and – at most – what a reasonable juror might find he associated with accepting the four cash payments from Kamara. Nor was there proof that anything that he did actually was circumventing procurement processes.

The Court gave a jury instruction for the "fraud" predicate of the bribery statute that read in relevant part as follows:

> The term "fraud on the United States" means to engage in a scheme or systematic course of conduct intended to deceive or, cheat, or obtain money or property **by means of materially false representations or promise** in a transaction of the federal government, which includes the District of Columbia government and its agencies, such as ONSE, or DYRS.

Final Jury Instructions -- FRAUD ON THE UNITED STATES – DEFINED (emphasis added).

However, with absolute disregard to meeting the elements of fraud requiring a material false representation, the Government gave the following closing argument:

> [T]he defendant, he is also guilty of bribery because he committed fraud against the United States. As you'll hear from Judge Contreras, what this really boils down to is whether the defendant cheated or attempted to cheat the District of Columbia government out of money or property.
>
> And you know the defendant did that because Mr. Kamara's contracts, they were with the Department of Youth Rehabilitation Services and with the Office of Neighborhood Safety and Engagement, which are agencies of the District of Columbia. These are lucrative government contracts. And there are expectations for how public officials are supposed to spend tax dollars. When the government is giving out money, it is supposed to go to the best people, it's supposed to go to the best companies, and it is supposed to go to the best possible resources.
>
> And there's a process to giving out that money, as Anwar Walker and Deputy Mayor Appiah came in here and told you. And what the defendant did is try to give out government contracts because he was getting paid. By circumventing the standard contracting process, the defendant was cheating the taxpayers, he was cheating the residents of the District of Columbia, and he was cheating the District of Columbia government.
>
> And by cheating the District of Columbia government out of money, the value of Mr. Kamara's lucrative government contracts, the defendant is guilty of bribery for committing fraud against the United States.

Trial Tr. 9/22/26 PM at 21:1-22:3.

Vague allegations of "cheating" without material misrepresentation do not constitute a valid predicate to the federal felony offense of bribery.

D. Mr. White Did Not Commit Any Violation of Official Duty Bribery

**1. Conflict of Interest**

No reasonable juror could find proof beyond a reasonable doubt that Mr. White received the cash payments with the corrupt intent of intending to be influenced to use his position to influence the outcome of a matter that he knew was likely to have a direct effect on his financial

interests. This allegation keys off of D.C. Council Code of Conduct, Period 25, p. 2, I(a), GEX 1 (redacted version).

The evidence at trial came in that Mr. White was having innocuous meetings with city officials seeking information about Kamara's contracts, and that was the point of the cash payments according to discussions with Kamara, as discussed above. Therefore, this theory of bribery fails.

**2. Official Acts**

No reasonable juror could find proof beyond a reasonable doubt that Mr. White received anything of value in return for being influenced in the performance of official acts in violation of his local ethics code's "official acts" bribery prohibition at the D.C. Council Code of Conduct, p.10, III(e)(2). This argument mirrors the argument above as to § 201(b)(2)(A).

**3. Confidential or Privileged Information**

No reasonable juror could find proof beyond a reasonable doubt that Mr. White received anything of value in return for being influenced to disclose or use confidential or privileged information acquired by their position without authorization. This allegation keys off of D.C. Council Code of Conduct, Period 25, p.19, VII(1), GEX 1 (redacted version). The defense is unaware of an iota of confidential or privileged information discussed at trial in connection with Kamara's contracting.

Nothing that Kamara testified about, or the Government argued in closing, qualifies. Kamara testified as follows:

> Q. Mr. Kamara, the defendant told you that the issue they had with Life Deeds is that they feel like you need to get somebody to go meet on a regular basis with CHV. First, what is CHV?
> A. CHV is the Columbia Heights Village located in 14th Street in Northwest, D.C.

> Q. And when the defendant said "the issue they had with Life Deeds," who did you think the defendant was referring to? Who's the "they"?
> A. "They" is pretty much the Office of Neighborhood Safety and Engagement had an issue with my company in Northwest D.C.
> Q. And when was your sense of when they told the defendant this information?
> A. Pretty much he's saying he has -- he had a meeting with the -- with the deputy mayor, and he's just conveying the conversation.
> Q. And prior to the defendant telling you that -- about this issue that they had with Life Deeds, did you know what CHV had said?
> A. No.

Trial Tr. 9/17/26 AM at 8:4-24.

The Government stretched this brief testimony of one witness, its cooperating defendant Kamara, into the following closing argument:

> As another example, the D.C. Council Code of Official Conduct prohibited the defendant from divulging information not available to the general public. That is exactly what the defendant did.
>
> Just one example of that. The defendant told Mr. Kamara that Columbia Heights Village, or CHB, was having issues with Life Deeds. And Mr. Kamara, he testified that he had never heard that information before. That was information not known to the general public. And giving Mr. Kamara this information violated the defendant's official duty.

Trial Tr. 9/22/26 PM at 23:2-11.

The Government lacked a basis in the evidence at trial to argue in closing that no members of the general public had access to the specified information, or that no members of the public were permitted access to this information. The Government certainly did not prove that Mr. White received payments with the purpose of obtaining information that no members of the general public had, or could legitimately obtain.

## II. NO OFFENSE OCCURRED FROM A PROPOSED AGREEMENT FOR MR. WHITE TO RECEIVE 3% OF THE PROCEEDS OF RENEWED D.C. CONTRACTS FOR VIOLENCE INTERVENTION IF MR. WHITE SEALED THEM UP

Furthermore, as to the alleged 3% deal for "sealing up" Kamara's violence intervention contract extensions, no reasonable juror could find that there is proof beyond a reasonable doubt of all of the elements of bribery, under either of the three provisions of § 201(b)(2). Kamara introduced this proposed arrangement into the second undercover meeting on July 17, 2024.

### A. There Was No Agreement as to 3%

Kamara and the FBI made up the terms of the 3% proposal at a meeting they had before the second meeting with Mr. White, according to the video of the second meeting (GEX 15) and the testimony of Kamara (who was uncertain as to which meeting with Mr. White it was before, the second or third). Trial Tr. 9/17/26 PM at 51:14-52:10; 52:17-53:7; 53:23-54:16.

First, it cannot be found by a reasonable juror to be beyond reasonable doubt that Councilmember White even accepted the 3% offer, because he replied in that second meeting to Kamara about it:

> MR. WHITE: I mean, uh, we, we good.
> MR. KAMARA: Yeah.
> MR. WHITE: We can worry about the money later, this issue is to stay on, stay on mission, see if we can keep everyone...
> THE INFORMANT: ...keep everything going
> MR. WHITE: keep everything afloat

Gov. Ex .15 12:00-12:09.

A reasonable juror would have to hold the doubt that Councilmember White was actually telling him "we good" as in: Kamara does **not** have to pay him. Mr. White then deflected the issue of payment until "later," preferring to talk about saving violence intervention programming.

On the stand, Kamara even alluded to the lack of a solid 3% agreement while discussing the third undercover video:

> Q. And what did you understand the point to be of setting up this meet -- of these meetings?
> A. Just pretty much at this time now, I think he has close to 25 or 30,000 that I've given him.
> Q. And so what was the point of these meetings?
> A. For us to solidify our agreement that he'll get 3 percent.

Trial Tr. 9/16/26 PM at 95:6-12.

Clearly, at this point, Kamara thought that the 3% agreement was still not solidified. As to Councilmember White, similarly, he simply never accepted Kamara's offer for 3% nor intended to do anything in exchange for it. In other instances where Kamara brings up the contract, Councilmember White sometimes redirects the conversation or does not intend to do what Kamara wants him to do which is seen by the Councilmember's lack of doing anything problematic in exchange. Furthermore, the Councilmember never materially engages with the terms of the agreement which would be reasonable for someone who actually intends to partake in an agreement. Kamara is the only one that talks about payment terms, amounts, etc.

B. Mr. White Did Not Have the Corrupt Intent to Be Influenced

As argued above in connection with the cash payments, there is a failure of proof beyond a reasonable doubt in this case that Mr. White had the specific intent that, in exchange for the thing of value, the 3% share Kamara offered, he **intended to be influenced** to act in the prohibited ways. *See United States v. Burke*, No. 25-3104, -- F. 4th --, 2026 WL 2794723, *10 (D.C. Cir. Sept. 18, 2026). A public official's mere knowledge that another person expects him to be influenced is insufficient; the public official himself must intend to be influenced. *Id.* Mr. White’s actions in doing nothing with city officials like he was saying he was to Kamara

establishes reasonable doubt as to his intent to be influenced. Kamara's intent and understanding does not count.

C. There Was No Act in Furtherance of the Alleged 3% Agreement

As the Court has decided, the jury "must unanimously agree on the overall scheme and at least one of the specified acts in furtherance of the scheme." *United States v. White,* No. CR 24-406 (RC), 2026 WL 1361545, at *4 (D.D.C. May 15, 2026). The Government proved no such act in furtherance of the alleged 3% agreement.

D. There Was No Intent to Be Influenced To Commit An Official Act

As argued in the section above as to the cash payments, there was no evidence in the trial record that Mr. White committed any official act, and all evidence is that he did not. A reasonable juror would have to entertain reasonable doubt that Mr. White intended to be influenced to commit an official act – notwithstanding any representations he made to Kamara about his actions when lured into the undercover meetings and pressed for news of his actions. The Government sometimes argued as if Mr. White's words to Kamara were enough to prove that his pressure for official acts actually took place – yet at other times the Government dismissed the importance of whether Mr. White ever acted in accordance with those words. Trial Tr. 9/22/26 PM at 18:11 – 19:4; 20:19-21. If the jurors could not be expected to believe Mr. White acted in accordance, there is also no reason for them to conclude beyond a reasonable doubt that he ever *intended* to act in accordance.

E. Mr. White's Alleged 3% Deal Contemplated No Fraud By Kamara

As argued in the section above as to the cash payments, there is no evidence in the trial record of Mr. White understanding that Kamara was engaged in any fraud in the violence intervention programs. There is no reason for the Court to entertain, or allow the jury to

entertain any unsubstantiated theory about the circumvention of procurement controls, or any other theory.

F. The 3% Discussion Included No Violation as to Confidential Information

As argued above as to the cash payments, there was no evidence in the trial record as to the breach of confidential or privileged information, or information as to which no member of the public could have had access, nor Mr. White's intention to do so, so the Court should grant judgment of acquittal based on this theory.

**LEGAL STANDARD FOR DISMISSAL ON DOUBLE JEOPARDY GROUNDS**

Mr. White separately moves to dismiss his Indictment because he cannot be retried under the Double Jeopardy Clause of the U.S. Constitution: "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const., amend. V. The Fifth Amendment thus protects against being prosecuted twice for the same crime, where "the ends of public justice" would not be served by allowing a retrial. *United States v. Perez*, 22 U.S. 579, 579-80 (1824). "Underlying this constitutional safeguard is the belief that 'the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.'" *United States v. Dinitz*, 424 U.S. 600, 606 (1976) (quoting *Green v. United States*, 355 U.S. 184, 187-188 (1957)).

Denying the Government a retrial would be a very unusual step after a hung-jury mistrial requested by the defense, but such is an outcome which either the case law allows, or which this Court may reach by distinguishing, limiting, and/or not extending existing precedent, and by adopting an extension or modification of existing law.

The scope of the Double Jeopardy Clause's applicability depends on how the first proceeding ended. When, as here, the first trial ends in a mistrial, the governing framework depends on whether the defendant requested or consented to the mistrial. *Oregon v. Kennedy*, 456 U.S. 667, 672–73 (1982). With that said, the Double Jeopardy Clause also involves a case-by-case approach, resistant to rigid formulation of rules based on categories of circumstances which will permit or preclude retrial. *See Harpster v. State of Ohio*, 128 F.3d 322, 328 (6th Cir. 1997) (quoting *United States v. Jorn*, 400 U.S. 470, 480 (1971)).

A defendant's motion for mistrial is "ordinarily assumed to remove any [double jeopardy] barrier to reprosecution." *Dinitz*, 424 U.S. at 607–08.

The Supreme Court has laid out an exception to this, so that a defendant's motion for mistrial does not necessarily waive any subsequent Double Jeopardy claims against mistrial. This exception would bar retrial "even where the defendant moves for a mistrial . . . where the prosecutor's actions giving rise to the motion for mistrial were done 'in order to goad the [defendant] into requesting a mistrial.'" *Oregon,* 456 U.S. at 673 (quoting *Dinitz*, 424 U.S. at 611). The inquiry from this line of cases turns on the prosecutor's subjective intent, which is a question of fact for the trial court. *Oregon v. Kennedy*, 456 U.S. 667, 675–76 (1982). The Supreme Court established this exception because "the defendant's valued right to complete his trial before the first jury would be a hollow shell if the inevitable motion for mistrial were held to prevent a later invocation of the bar of double jeopardy in all circumstances." *Kennedy*, 456 U.S. at 673. The Double Jeopardy Clause "bars retrials where 'bad-faith conduct by judge or prosecutor,' threatens the '(h)arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict' the defendant." *Dinitz*, 424 U.S. at 611 (citations omitted).

Courts have grappled with the issue of whether to extend *Kennedy* in cases of prosecutorial misconduct (i.e. in cases where there was prosecutorial misconduct but no goading of the defendant into moving for a mistrial) and how this rule could interact with deadlocked juries.

First, there is the *Wallach* theory, under which retrial may be barred where the prosecutor's misconduct was intended to avoid an acquittal the prosecutor believed to be likely. *United States v. Wallach*, 979 F.2d 912, 915–16 (2d Cir. 1992). Courts have debated whether to accept or decline that extension. *See, e.g.*, *United States v. Doyle*, 121 F.3d 1078, 1083 (7th Cir. 1997); *Jacob v. Clarke*, 52 F.3d 178, 181 (8th Cir. 1995); *c.f. United States v. Hammer*, No. 4:96-CR-239, 2011 WL 6020555, at *4, *6 (M.D. Pa. Dec. 1, 2011) (acknowledging that circuit courts have discussed extending *Kennedy* to prosecutorial misconduct discovered only after trial and conviction, but describing *Kennedy* as "a case of limited scope").

There are also separate court decisions questioning whether *Kennedy* applies to a mistrial when misconduct by the judge or the prosecutors came first, **followed** by a jury deadlock, which is a fact pattern *Kennedy* did not contemplate in its narrow exception. *See, e.g.*, *Betts v. Tibbals*, No. 1:11-CV-01107, 2014 WL 4794530, at *33 (N.D. Ohio Sept. 24, 2014) (Betts's claim presented the "somewhat unusual backdrop of potential double jeopardy implications following the *denial* of the motion for mistrial and the case is then retried following a hung jury.")

The limitation of the reach of the *Kennedy* decision is to be expected, since that decision proceeds from the premise that "the Double Jeopardy Clause affords a criminal defendant a 'valued right to have his trial completed by a particular tribunal.' *Kennedy,* 456 U.S. at 671-72. The hung jury obviously does not afford the defendant the option to exercise that right. Accordingly, it might be a stretch to apply principles discussed in *Kennedy* to a case where the

actual cause of the mistrial was an inability of the jury to reach a verdict. *See Whiteside v. Warden, Southern Ohio Correctional Facility*, 2011 WL 5551598 * 9 (S.D.Ohio Nov.15, 2011), report and recommendation adopted 2012 WL 3637369 (Aug. 22, 2012).

The result of the foregoing analysis is the firm conclusion that there is under existing law no absolute rule governing a case involving *both* (a) prosecutorial and/or judicial misconduct, and (b) a later hung jury.

In these circumstances of precedential uncertainty, Mr. White contends that prosecutorial and/or judicial *misconduct that may have led to a later hung jury* may at the discretion of the court bar retrial under the Double Jeopardy Clause, to vindicate all the protections to the individual afforded by that Fifth Amendment right, and to best serve the "ends of public justice."

**ARGUMENT FOR DISMISSAL ON DOUBLE JEOPARDY GROUNDS**

Mr. White respectfully requests that the Court should bar his retrial and dismiss the Indictment. In the case at bar, Government over-reaching -- to some extent allowed by the Court, and to some extent not -- set the stage for the deadlocked jury. These circumstances take this case out of the rule ordinarily permitting retrial after a mistrial requested by the defense.

As argued repeatedly in the pretrial and trial phases, the Government should not have been permitted to intermingle before the jury in one count between five to seven options for predicates leading to a bribery conviction, with no juror unanimity required as to which predicate or predicates the jurors had found beyond a reasonable doubt as the defendant's purpose for a particular payment.

Here, the Government enticed the jury with bribery predicates for which it offered absolutely no serious evidence. As described in the Rule 29 motion, here the Government argued a fraud predicate for which it offered no proof of material misrepresentation, and argued a

predicate of violating the D.C. Council Code of Conduct provision related to privileged, confidential, and/or non-public information, without evidence that the information was not known or legitimately knowable by members of the public. The prosecutors expressly urged the jurors to seize on these arguments, which were baseless, leading to the likelihood of a deadlocked jury where there was no unanimity as to predicates required.

The Government should not have been permitted to introduce "overview" evidence that Mr. White was under FBI investigation as far as 2023, when there was no causal connection between that investigation and the Indictment in this case. This was an unprecedented and prejudicial misuse of overview testimony.

The Government also should not have been permitted to encourage hold-outs for conviction with emphasis on discussions of mental health contracting and other unspecified U.S. Federal contracting possibilities it called "bribery," after giving no support to the proposition that these allegedly corrupt discussions were *necessary* to proving the bribery scheme for D.C. violence intervention contracting charged in Count One. Moreover, the Government spoke out of both sides of its mouth, saying that it would not argue these facts as a basis for conviction, while doing just that:

> **We're not arguing that he violated any sort of statute in this case. We're talking about the federal contracts.** That's just in the evidence. And certainly, it provides additional evidence that the defendant agreed to Mr. Kamara's terms with respect to his contracts with ONSE and DYRS, because it shows motive, intent, opportunity, all those kind of things. **But are we going to argue to the jury that that is somehow part of the reason he's guilty of bribery in this case? No, we're not, Your Honor.**

Trial Tr. 9/18/26 PM at 27:7-15 (emphasis added).

Still worse, a jury instruction given by the Court over the defense's objection risked inflaming jurors by drawing attention to what it referred to as "testimony about bribery schemes" that the jury could "accept." This language was in a Government fastball thrown at 7:50 am the morning of the jury's instruction -- in disregard of the Court's suggestion to meet and confer with the defense, after the Government's proposal to submit a limiting instruction. When the defense realized what had happened, it was not too late. Because the defense had requested a limiting instruction in the first place (not the Government), there was no reason for the Court not to withdraw the instruction at the defense's request to avoid the risk of tainting the jury. The Court could have easily torn this instruction out of the package of instructions at the last minute.

In the absence of a unanimity requirement, hold-outs for conviction on Mr. White's jury stood encouraged in all these ways to pin the label of corruption on Mr. White without even one single charged theory of bribery lining up properly and gaining unanimity.

The law does permit the Government to charge a crime where its agent proposed the illegal scenario to the defendant in an undercover sting operation. But the ends of public justice do **not** require that an alleged offense which the government itself manufactured in the first place be the subject of multiple trials until the Government finds a jury willing to convict the target of its operation.

For all of the above reasons in this case, where government over-reaching of various kinds risked and likely caused the hung jury and prevented Mr. White's acquittal, the ends of public justice do not require retrial – they require dismissal. Here, the "State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the

possibility that even though innocent he may be found guilty." *United States v. Dinitz*, 424 U.S. 600, 606 (1976).

## CONCLUSION

WHEREFORE, the defendant respectfully requests that his motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, be GRANTED, and that his motion for dismissal on double jeopardy grounds be GRANTED.

Dated: October 6, 2026

Respectfully submitted,

*/s/ Warren Gary Kohlman*
Warren Gary Kohlman (DC #177527)
1845 R Street Northwest
Washington, DC 20009
202-497-4468
Email: gwkohlman@gmail.com

*Counsel For Defendant Trayon White, Sr.*

*/s/ Bruce H. Searby*
Bruce H. Searby (DC # 1012382)
Nicole C. Ledesma (DC # 90020184)
SEARBY PLLC
2000 P Street NW, Suite 705
Washington, D.C. 20036
Tel: (202) 750-6106
Email: bsearby@searby.law

*Counsel For Defendant Trayon White, Sr.*

CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of October 2026, this **TRAYON WHITE'S OMNIBUS POST-TRIAL MOTION FOR ACQUITTAL AND/OR DISMISSAL ON DOUBLE JEOPARDY GROUNDS** was served via electronic mail on chambers, and counsel of record by ECF/CM filing.

Respectfully submitted,

*/s/ Bruce. H. Searby*