**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>TRAYON WHITE, SR.,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No: 1:24-cr-00406-RC<br><br>JUDGE RUDOLPH CONTRERAS |

**<u>TRAYON WHITE'S REPLY TO THE GOVERNMENT'S OPPOSITION TO DEFENDANT'S OMNIBUS MOTION FOR JUDGMENT OF ACQUITTAL AND/OR DISMISSAL ON DOUBLE JEOPARDY GROUNDS</u>**

Defendant Trayon White, Sr., through undersigned counsel, respectfully replies to the Government's Opposition to Defendant's Motions for Judgment of Acquittal or Dismissal ("Opposition"), filed on October 13, 2026. (ECF No. 144.) The Opposition responded to Mr. White's Omnibus Motion, filed on October 6, 2026. (ECF No. 143.)

**INTRODUCTION**

The Opposition to Mr. White's Omnibus Motion exhibits the same unwillingness to face the reality of what actually happened at trial that marked the Government's rash post-mistrial announcement that it would retry this case. As to the sufficiency of evidence under Rule 29, the Opposition ignores a gaping hole in proof of Mr. White's corrupt intent that makes this case stand out amongst those where law enforcement has had the ideal opportunity of recording a defendant's handling of alleged bribe payments. Similarly, the Government would rather avoid in its Opposition debating how the mistrial in this case arose in an unusual procedural posture -- a hung jury after identifiable overreach and error likely contributed to the deadlock -- taking it out of the line of cases interpreting the Double Jeopardy Clause so as to allow retrials.

The Opposition is also of a piece with the decision to prosecute Mr. White in the first place, made by rashly leaping to conclusions about what the undercover recordings really established. The FBI publicly arrested Mr. White only weeks after receiving Mr. Kamara's allegation against him. Trial revealed that the Government made no effort to confirm through any proof beyond its staged meetings that Mr. White had taken a single corrupt action as to Mr. Kamara's D.C. contracts for violence interruption. The Government was on such a tear to indict Mr. White in the weeks before his election that no one must have double-checked to see if there was *any* evidence for the Indictment's theory that Mr. White was committing "fraud," or that he was "disclosing or using confidential or privileged information acquired by his position without authorization." (ECF No. 12 at 2.) There was no such evidence.

At trial before a jury, the Government's case finally ran into a *Burke* wall, so to speak. That is, the Government was unable to prove beyond a reasonable doubt that Mr. White *intended to be influenced or induced* to take *any* corrupt action in exchange for money or promises of money. *See United States v. Burke*, No. 25-3104, -- F. 4th --, 2026 WL 2794723, at *10 (D.C. Cir. Sept. 18, 2026) (government must prove beyond a reasonable doubt that the defendant intended to be influenced in the performance of a specific official act or acts). Though Mr. Kamara delivered mantra-like testimony on direct examination that *he* expected Mr. White to seal up his contract renewals in exchange for the FBI cash, such testimony missed the mark as recognized by *Burke*.

Now, purportedly showing sufficient evidence of corrupt intent, the Government's Opposition merely rehashes Mr. White's videorecorded words describing interactions with D.C. officials that were either *innocuous*, or else *did not happen*, as the Government's own witnesses from the city testified at trial. However, after the close of the Government's case, no reasonable

juror could have taken Mr. White's videorecorded words at their face value as proof beyond a reasonable doubt of his corrupt intent. The Government thus seeks to avoid one of the holdings of the *Burke* decision (which it does not discuss) that it is *not* the expectation of *others* that counts; Mr. White must be shown to have intended to be influenced to act corruptly -- beyond a reasonable doubt. To make matters worse, the Opposition's paraphrasing of Mr. White's videorecorded words is highly unreliable; instead, when not directly quoting those words, the Government often simply adds in words that it *wishes* were there.

The Opposition also fails to grapple with Mr. White's real argument for dismissal and against retrial on Double Jeopardy grounds -- and instead constructs a strawman. Mr. White has *not* alleged that the Government was intentionally goading the defense into mistrial motions, as the Government tells it. Instead, Mr. White has staked his Double Jeopardy claim on various circumstances that hopelessly frustrated his full acquittal, and has urged this Court to apply the legal standard that the ends of public justice do not require a retrial under such circumstances.

For these reasons, as further argued below, the Court should now grant Mr. White's motions for acquittal and/or dismissal.

**ARGUMENT ON RULE 29(a) MOTION**

After watching the videorecorded meeting several times, we all know what the Government considers evidence for conviction. What the Opposition tends to ignore is Mr. White's argument in the Rule 29(a) Motion that, despite this evidence, a reasonable juror must have had reasonable doubt as to Mr. White's guilt of bribery based on other evidence introduced during the Government's case-in-chief disproving his corrupt intent.[1] The moving papers

[1] In arguing for Rule 29 judgment of acquittal, Mr. White is of course *not* contending that the three jurors who held out for his conviction were *themselves* being unreasonable -- just that the Government succeeded in creating conditions unreasonably conducive to some jurors holding out for conviction.

disentangled, spread out, and individually addressed the Government's crowded bin of legal theories, noting that trial made clear for the first time the distinct courses of the cash payments and the alleged 3% deal. In response, the Opposition does not address a substantially large amount of Mr. White's arguments as shown below. Even where the Opposition does do so, the Court should beware of its factual recitations, notable for their overly aggressive inferences that exaggerate the weight of the evidence.

## I. AS TO KAMARA'S CASH PAYMENTS TO MR. WHITE, THE OPPOSITION DOES NOT SHOW PROOF OF CORRUPT INTENT BEYOND A REASONABLE DOUBT

### A. There Was Insufficient Evidence of Mr. White's Intent To Be Influenced In Any Quid Pro Quo

The Opposition does not evince sufficient proof at trial of corrupt intent by Mr. White in accepting the cash payments to be influenced or induced in any way. Here there is a generalized failure. More specific failures as to bribery predicates are also addressed below.

The Government does not address the momentous and timely decision in *United States v. Burke*, No. 25-3104, -- F. 4th --, 2026 WL 2794723 (D.C. Cir. Sept. 18, 2026), a case where the D.C. Circuit held that the *defendant* had to have had the specific intent that, in exchange for the thing of value, he intended to be influenced to act in the prohibited ways. (ECF No. 143 at 17, 29.) This case law is key to this case, because, as stated in the Omnibus Motion, "Mr. White's intent matters; Kamara's does not." (*Id*. at 17.)

The Government also does not address many specific highlights of the conversations between Kamara and Mr. White cited in the moving papers which show that there was no *quid pro quo* for the cash even on the face of their recorded conversations.

For example, the Omnibus Motion focused on the moment in the first video where Kamara simply shoved the envelope towards Mr. White with no specific action requested or

solicited, followed soon by Mr. White's specific words, "I don't want to feel like you got to give me something to get something done. We better than that." (*Id*. at 18.) Kamara responded in acknowledgement that this is not a bribe: "I'm not saying use this to go do that." (*Id*.) The Opposition does not reply as to these early events which are so problematic to the Government's case. The Opposition also ignores that, in direct reference to the cash in this meeting, Mr. White talked about his campaign's financial difficulties, which Kamara knew about and had raised to the FBI specifically in connection with their plan to give Mr. White cash. (*Id*.). Nor does the Opposition address the defense point that, in saying he would be "hitting [Mr. White] off" regularly, Kamara presaged a whole stream of payments that came with no strings attached.

Then as to the second cash payment, the moving papers pointed to the lack of a specific nexus between the cash and any requested action, as well as to Kamara's previous un-moored offer of "if you need anything." (*Id*.) The Opposition does not address this back-and-forth, either.

The Opposition also does not respond to the moving papers regarding how, at trial, evidence from the videos and answers from Kamara on the stand came out departing further from its narrative that the cash he handed Mr. White was a bribe, versus something else. (*Id*. at 18-19.) For instance, the defense noted that Kamara described on the video his later cash payment as follows: "That's definitely for your hard work and knocking things out with Kwelli." (*Id*. at 19.) Additionally, when asked about this statement by the prosecutor at trial, Kamara said that it was to thank him for reaching out to individuals, supposedly making contact with the deputy mayor, and trying to make contact with the mayor and the grants manager. (*Id*.)

Mr. White's moving papers also pointed out that no other discussion of cash money at the third and fourth undercover meetings involved promises of any action by Mr. White either; rather, specific texts were exchanged prior to those meetings regarding the money Kamara had

said he would regularly give, but which did not prove Mr. White's intent to engage in a *quid pro quo*. (*Id*. at 19-20.) There is no response on this in the Opposition.

Rather than respond to these points, the Government embroiders the record elsewhere. The Opposition asserts that "when Kamara handed the Defendant the money and asked him if he was going to 'keep it going,' the Defendant accepted the cash and reassured Kamara that he was working on his end of the corrupt agreement." (ECF No. 144 at 10.) However, the recorded statement cited by the Government,[2] as one might expect, does not include Mr. White stating that he was "working on his end of the corrupt agreement." This is a fanciful characterization by the Government; by inserting "his end of the corrupt agreement" into what is presented as a summary of Mr. White's words, the Government gives the recording an evidential weight that it has not earned.

The FBI and Kamara contrived all five meetings, but cannot now spin through argument or interpret testimony of Mr. White's conversations to claim that the cash payments were, beyond a reasonable doubt, exchanged for anything Mr. White intended to do, in accordance with *Burke.* The Government's lack of engagement with the arguments in the Omnibus Motion related to these five meetings and *Burke* speaks volumes.

B. <u>Mr. White Neither Agreed To, Nor Caused, "Official Acts" For the Cash</u>

The Opposition does not respond to the moving papers about Mr. White's cross-examination of DYRS Grants Management Specialist Anwar Walker, ONSE Director Kwelli Sneed, and Deputy Mayor Lindsey Appiah. Their testimony as government witnesses showed that Mr. White did not pressure any of them to do anything to favor Kamara's businesses. (ECF No. 143 at 21-22.)

---

[2] ECF No. 144 at 10 (citing GEX 16 at 13:43-13:58, GEX 16A at 24:7-16.)

Indeed, viewing the Government's evidence through the lens that it insists upon, the following becomes crystal clear: While the Government introduced evidence that arguably can be interpreted as suggesting what Mr. White claimed what he might do, the balance of testimony by the Government's witnesses established beyond cavil that he had no intention of doing anything that would constitute bribery. Put another way, if it was the defense, not the Government, that called as witnesses Anwar Walker, Kwelli Sneed and Lindsey Appiah, the Government might be able to argue in response to a Rule 29 motion that the jury was free to disregard their testimony. Here, however, the Government sponsored their testimony. By doing so, it fatally infected its case by establishing conclusively that Mr. White had no intent to commit any form of bribery. Each of those witnesses proved that Mr. White did no more than ascertain the status of a constituent's contracts, conduct that is fully within the protected zone of *McDonnell v. United States,* 579 U.S. 550 (2016). To draw a comparison, our record is no different than a garden variety assault case where the government's own witnesses established conclusively that the defendant acted in self-defense.

Thus, the Opposition does not engage with the testimony by Kamara where he acknowledged asking Mr. White to look into the status of his contracts. Although the Government does not have evidence of Mr. White doing anything further, the Government asserts that "[c]learly the Defendant agreed to do more than simply check the status of Kamara's companies' contracts. . . ." (ECF No. 144 at 8.)

To bolster this assertion, the Government again dresses up interpretive argumentation as evidence when discussing Mr. White's alleged intent to perform official acts. (ECF No. 144 at 10-11.) For example: "There is additional evidence that the Defendant intended to perform Official Acts, as he stated that he had long-term strategy," the Government claims. (*Id.* at 10.)

Yet the Government fails to explain how the existence of an alleged "long-term strategy" is evidence of intent to perform official acts. In order to support this assertion, the Government cites three quotes: GEX 15A at 8:16-9:5 (Defendant said he was "building a relationship" with the relevant city officials); GEX 16A at 4:15-17 (Defendant said "I wanted to bring you up to speed before we go in here about stuff I've been working on, trying to get you where you need to be."); and GEX 18 at 10:45-10:58, 18A at 15:16-20 (Defendant said, "Let me follow with DYRS too"). (*Id.*) The Government characterizes the conduct discussed ("building a relationship" with Government officials, setting up meetings with Government officials, and contacting Government officials, respectively) as an ongoing plan to take an official act, but simply stating that the defendant's comments amount to a plan to be influenced to commit official acts does not make them so. (*Id.*)

Similarly, the Government places heavy weight on Mr. White's statement at a point in time following his receipt of cash that he would "start making some shit happen." (*Id.*) The Government never explains how this quote, despite its strong flavor, is strong evidence that Mr. White intended to carry out official acts *versus* non-prohibited meetings and other communications.

Furthermore, even if these statements are *some* evidence, they are not proof beyond a reasonable doubt in the face of undisputed evidence that Mr. White actually did nothing crossing the line into official acts. Put on the spot by Mr. Kamara in the informant's car, Mr. White described real-world events with something other than accuracy. Knowing this, a reasonable juror cannot have concluded beyond reasonable doubt that Mr. White accurately described his *intent* to Mr. Kamara, either.

C. No Reasonable Juror Could Find Mr. White Helped Commit Fraud For Cash

The Opposition does not put any more meat on the bones of Government's fraud predicate in response to the defense claim that its fraud theory lacks any evidence.

As an initial matter, the Government does not respond at all to the defense's point that the Court's jury instruction for the "fraud" predicate of the bribery statute states a requirement to engage in fraud "by means of materially false representations or promise." (ECF No. 143 at 24.) There are no facts to support that Mr. White engaged in fraud by means of materially false representations or promise in substantiating its continued claims of fraud. The vague allegation the Government included in its closing of "cheating" is -- without material misrepresentation – no more than a schoolyard taunt and does not constitute a valid predicate to the federal felony offense of bribery.

Instead, the Government assumes that it can get a conviction on the basis that Mr. White was "circumventing" any specific required procurement process. Assuming *arguendo* this were a valid legal theory, all that the Government shows in its Opposition is that Kamara's contracts were with the District of Columbia and that those contracts have standard procedures. The Government does not show how those procedures were violated, or how Mr. White intended them to be violated. For example, the Government discusses how the standard process for contract renewals includes "collecting data" and "scoring the applications" and "performance measures" but does not have any evidence of Mr. White asking the Grants Manager or anyone else to skew the data and performance measures in Kamara's favor. (ECF No. 144 at 12.)

D. No Reasonable Juror Could Find Mr. White Traded Confidential or Privileged Information, or Even Information to Which the Public Was Not Permitted Access

Similarly, the Government certainly did not prove that Mr. White received payments with the purpose of obtaining and conveying to Kamara information that members of the general

public could not freely and legitimately obtain. The Government includes one sentence from Mr. White to Kamara: "...they feel like you need to get somebody to go meet on a regular basis with [Columbia Heights Village]." (ECF No. 144 at 14.) The Opposition offers no analysis or supporting evidence that this was confidential, privileged, and non-public information that Kamara (or any citizen) could not have gotten himself. The Opposition did not respond to the defense's claim in the moving papers that there was therefore no basis in the evidence at trial to argue this to the jury in closing arguments.

## II. THE OPPOSITION SHOWED INSUFFICIENT EVIDENCE OF AGREEMENT OR INTENT TO BE INFLUENCED TO "SEAL UP" KAMARA'S CONTRACTS FOR A 3% SHARE

Turning to the proposed 3% agreement, hatched by the FBI and Kamara and presented to Mr. White in the second meeting, the Government's Opposition follows the same pattern of not engaging with the defense's arguments and, instead, exaggerating the weight of the videorecorded evidence.

### A. There Was a Lack of Compelling Evidence of an Agreement for 3%

The Government does not engage with the defense's example of a lack of an agreement as to the 3%, namely, the video in which Mr. White was actually telling Kamara "we good" as in: Kamara does **not** have to pay him. Mr. White then deflected the issue of payment until "later," preferring to talk about saving violence intervention programming. (ECF No. 143 at 28.)

Likewise, the Government ignores the fact cited in the moving papers that on the witness stand at trial, while discussing the third undercover video, Kamara even admitted to the lack of a "solid" 3% agreement. (ECF No. 143 at 29.) There is also no discussion in the Opposition about how Mr. White on video never materially discusses the terms of the supposed agreement, which would be expected from someone who actually intends to partake in an agreement. (*Id.*) Kamara

is the only one that talks about payment terms, amounts, and expectations for the proposed agreement. Mr. White is monosyllabic reacting to the proposal itself, then turning the talk to city personnel about whom he had knowledge – deal or no deal.

Common sense required a reasonable juror to discount Mr. White's vague and ambiguous words as signs of agreement. On the witness stand, Kamara effectively admitted he did so, too.

B. Mr. White Did Not Have the Corrupt Intent to Be Influenced By Promises of 3%

As argued above in connection with the cash payments, there is a failure of proof beyond a reasonable doubt in this case that Mr. White had the specific intent that, in exchange for the thing of value, the 3% share Kamara offered, he **intended to be influenced** to act in the prohibited ways. *See United States v. Burke*, No. 25-3104, -- F. 4th --, 2026 WL 2794723, *10 (D.C. Cir. Sept. 18, 2026). A public official's mere knowledge that another person expects him to be influenced is insufficient; the public official himself must intend to be influenced. *(Id.)* Mr. White's doing nothing with city officials, in contradiction to some of the things he was saying on video that he was doing, establishes reasonable doubt as to his intent to be influenced. Kamara's intent and understanding do not count.

As evidence that Mr. White intended to be influenced by the 3% agreement to commit official acts, the Opposition points to recorded statements that are, in reality, subject to the opposite or neutral interpretation. For example, the Government highlights that on August 18, 2024 (roughly a month after the Government alleges Mr. White agreed to a "3% deal"), Mr. White said he had not "spoke to DYRS, um, which I need to."[3] (ECF No. 144 at 10.) This sentence does not lend itself to the conclusion that Mr. White was telling Kamara he would engage in an official act, since mere speaking is not an official act. Similarly, Mr. White's use of

[3] The Government has added the word "nagged" in its written rendition of the audio of this recording, but listening to the audio does not bear out the existence of this word. *See* GEX 18 at 11:13-22.

vocabulary like "talking" and "moving" and "telling" and "working" all reflects this same essential ambiguity, where Mr. White did not pin himself down on what if anything he planned to do for Kamara. Mr. White told Kamara an apocryphal story about having let program manager Ms. Kwelli Sneed know he might not support her, but the Government takes liberties with the actual words on the video when asserting Mr. White said he would do this "unless she extended Mr. Kamara's contracts . . . ." (*Id*. at 11.) In fact, Mr. White spoke at a higher level than Mr. Kamara's specific contracts. (*Id.* at 11 citing GEX 18 at 11:04-11:35, GEX 18A at 16:1-13.)

Nor does the Government point to evidence that Mr. White *intended to follow through* on whatever things he told Mr. Kamara, close in time to the discussions of the 3%, that he would say or do with city staff. Yet if there was no intent to follow through, as this Court told the jury in response to Jury Note No. 2, there was no crime of bribery. (9/24/2026 Proceedings at 10:13-18.)

**ARGUMENT FOR DISMISSAL ON DOUBLE JEOPARDY GROUNDS**

The Government's response to Mr. White's motion for dismissal on Double Jeopardy grounds has the foundational error of claiming that Mr. White makes a "claim that the government intended to provoke him to request a mistrial . . . ." (ECF No. 144 at 15.) On this basis, the Opposition declares Mr. White's motion groundless in fact, notwithstanding various actions and positions taken by the Government before and during the trial to which the defense objects. However, a claim of intentional provoking or goading the defense into calling for a mistrial is not the basis of this motion, and indeed the Government entirely ignores the true gravamen of Mr. White's motion.

The Government relies for the "intentional goading" standard on *Oregon v. Kennedy,* 456 U.S. 667, 671–72 (1982), a case discussed and distinguished by Mr. White because it did *not*

involve a hung jury. (ECF No. 143 at 33.) The Opposition ignores the case law cited by Mr. White in his moving papers thus distinguishing *Kennedy*. (*Id*., at 33-34.)

In the end, the case at bar is neither one governed by the rule of mistrials requested by the defense following some inappropriate government or judicial conduct, nor one where the court declares a mistrial after a mere inability of the jury to reach a verdict. This case is a combination of the two, where there was (1) a hung jury and (2) some inappropriate government and/or judicial conduct that is a basis of a mistrial motion. The case law about retrials has never been so black-and-white as the Government assumes in its Opposition. The law of Double Jeopardy provides for case-by-case analysis, leaving room for the Court to reject retrial in the current instance, and it should do so for the following reasons.

The "intentional goading" standard should not be applied, because unlike in the *Kennedy* line of cases, Mr. White had no chance here to persist to reach a verdict despite government or judicial error. On the fourth day of deliberations, the jury here assured the Court that its views had "cemented" into two sides, and the Court granted the defense's motion. In addition, however, the defense noted at the time that its mistrial motion had deeper bases than the mere inability of the jury to reach a unanimous verdict – going back, *inter alia*, to the inflammatory jury instruction language referring to other "bribery schemes." (9/28/26 Proceeding at 2-3:17-5.) The Court allowed the defense to supplement in writing its mistrial motion calling attention to this and to the other errors that it claims required a mistrial. (*Id*. at 5-6:18-7.)

The Government's response, as anticipated, claims that there were no such errors as the defense incorporates into its mistrial motion. (ECF No. 144 at 15-16.)

Now is not the time and place to re-litigate all of these issues. However, the defense draws the Court's attention to the following updates on that last jury instruction at issue (LIMITING INSTRUCTION REGARDING CERTAIN EVIDENCE):

- In the Opposition, the Government still has not argued any "necessity" to proving the charged offense among its justifications for its so-called intrinsic evidence of "other bribery schemes" involving mental health and federal contracting.
- The Government still has not explained why the words "bribery schemes" (not even the more circumspect "*alleged* bribery schemes") were accurate, helpful and not prejudicial in giving a limiting instruction to the jury.
- The Government does not deny that it told the Court it would meet and confer with the defense over the proposed jury instruction, but then never shared a draft of it with the defense before e-filing it shortly before court.

This jury instruction, needlessly included even after the party that had requested it had withdrawn its request, was just part of a larger set of factors that could forestall a full acquittal.

As argued above, there was no evidentiary basis to include some of the Government's predicate legal theories in the first place, especially in what it claimed was such a simple case. The Government did not appropriately explain in its Opposition how Mr. White engaged in fraud or in violating confidentiality, and the Government therefore enticed jurors with bribery predicates for which it offered absolutely no serious evidence. (ECF No. 143 at 34.)

Furthermore, the use that this Court permitted of notoriously perilous "overview evidence" was unprecedented, because there wasn't a factual nexus to the charges filed and tried. This was on top of the objectionable admission of Mr. Kamara's allegation that Mr. White took a

2019 bribe, which the Government never corroborated and was therefore more prejudicial than probative.

Finally, the lack of a sufficient requirement of jury unanimity about bribery predicates allowed individual jurors to choose *a la carte* from five theories of predicates, encouraging minority theories of Mr. White's basic intent. Here, three hold-outs for conviction could insist on pondering their own theories about predicates, including ones with no evidence, without agreeing on the same theory of conviction. As the defense argued repeatedly in the pretrial and trial phases, and again in its omnibus motion, the Government should not have been permitted to intermingle before the jury in one count five options for predicates leading to a bribery conviction, with no juror unanimity required as to which predicate or predicates the jurors had found beyond a reasonable doubt as the defendant's purpose for a particular payment. (*Id*.) In the absence of a unanimity requirement, hold-outs for conviction on Mr. White's jury stood encouraged in all these ways to pin the label of corruption on Mr. White without even one single charged theory of bribery lining up properly and gaining unanimity.

In the end, the Opposition ignores how the Government engineered this whole complicated state of affairs, and instead simply assumes the most commonly applicable rule for defense-requested mistrials, the "intentional goading" standard. In doing so, the Government provides no real response to why the interests at stake in Double Jeopardy clause should not be vindicated, as part of a case-by-case analysis consistent with precedent, if indeed government and/or court errors made a subsequent hung jury more likely.

Finally, the Opposition does not contend with the defense's point in the moving papers that the ends of public justice do not require that an alleged offense which the government itself

manufactured in the first place be the subject of multiple trials until the Government finds a jury willing to convict the target of its operation. (*Id*. at 36.)

## CONCLUSION

The Government has had ample opportunity to prosecute its proactively planned undercover sting case. The lopsided split of the hard-working jury that sat in this case would under any other circumstances have persuaded prosecutors against retrial. The Opposition reflects the same blinding animus against an elected official whom, for whatever reason, the Government scorns. It is up now to the Court to recognize the magnitude of the errors in the Government's case and to deliver judgment for the defense.

WHEREFORE, the defendant respectfully requests that his motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, be GRANTED, and that his motion for dismissal on Double Jeopardy grounds be GRANTED.

Dated: October 20, 2026

Respectfully submitted,

*/s/ Warren Gary Kohlman*
Warren Gary Kohlman (DC #177527)
1845 R Street Northwest
Washington, DC 20009
202-497-4468
Email: gwkohlman@gmail.com

*Counsel For Defendant Trayon White, Sr.*

*/s/ Bruce H. Searby*
Bruce H. Searby (DC # 1012382)
Nicole C. Ledesma (DC # 90020184)
SEARBY PLLC
2000 P Street NW, Suite 705
Washington, D.C. 20036
Tel: (202) 750-6106
Email: bsearby@searby.law

*Counsel For Defendant Trayon White, Sr.*

CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of October 2026, this TRAYON WHITE'S REPLY TO THE GOVERNMENT'S OPPOSITION TO DEFENDANT'S OMNIBUS MOTION FOR JUDGMENT OF ACQUITTAL AND/OR DISMISSAL ON DOUBLE JEOPARDY GROUNDS was served via electronic mail on chambers, and counsel of record by ECF/CM filing.

Respectfully submitted,

*/s/ Bruce. H. Searby*